[Civil No. 3913. Filed June 27, 1938.]

[80 Pac. (2d) 698.]

# DEL E. WEBB, Doing Business as DEL E. WEBB CONSTRUCTION COMPANY, Appellant, v. CRANE COMPANY, a Corporation, Appellee.

Messrs. Snell, Strouss & Salmon, for Appellant.

Mr. L. J. Cox, for Appellee.

McALISTER, C. J.—In October, 1935, Del E. Webb, doing business as Del E. Webb Construction Company, entered into a contract with the Arizona State Teachers College at Flagstaff to construct an addition to Taylor Hall located on the campus of that institution. At the same time Webb, as principal, and the Massachusetts Bonding and Insurance Company, as surety,

executed two bonds to the school, one in the principal sum of $120,609.18, and referred to as the performance bond, and the other in the principal sum of $9,000 and referred to as the labor bond. Fred Langston, a subcontractor, did the plumbing work on the building and the plaintiff, Crane Company, furnished him the material for the job. Some time after the work was completed Crane Company, claiming that Langston owed it $6,093.84 for the plumbing fixtures, brought an action for this sum on the performance bond against Del E. Webb and his surety, the Massachusetts Bonding and Insurance Company, and Langston, upon the theory that that bond was a third party bond and that all persons who had furnished material for the building were protected by it. A trial before the court resulted in a judgment in favor of the plaintiff for the full amount asked for, and it is from this judgment that the defendant, Del E. Webb, appeals.

Appellant advances two propositions in support of his appeal. The first is that the performance bond is not a third party bond and, therefore, gave the Crane Company no right of action on it, and the second is that $4,454.96 of the $6,093.84 sued for had been paid by Langston to appellee, and that even if the latter could sue on the bond, it should recover only the difference between these amounts, namely, $1,638.88.

Appellant rests his contention that the performance bond gave no one but the school the right to sue on it upon the language of the bond itself and the wording of the statutes relating to such bonds.

One of the conditions of this bond is:

"That if the principal herein . . . shall promptly pay all laborers, mechanics, subcontractors and materialmen, and all persons who shall supply such laborers, mechanics or subcontractors, with material, supplies or provisions for carrying on such work, all just debts, dues and demands incurred in the per-

formance of such work (which shall not be construed to include money borrowed from third parties) . . . ."

■ Neither the contract nor the performance bond itself gives in express terms a direct right of action on the bond to materialmen, and since this condition deals with the payment to laborers, mechanics, subcontractors and materialmen, appellant contends that it must be given the meaning it would have if applied to any one of these four groups. For instance, if it were not the purpose of this provision to give a direct right of action on the bond to laborers, clearly it was not intended that materialmen should have that right either. This being true, he argues that the circumstances attending the execution of the bond show that it was not intended by the parties that any one of the four groups of third persons—laborers, mechanics, subcontractors and materialmen—should have this right, and the particular circumstance upon which he relies to establish this is that at the time the contract and the performance bond were executed another bond, commonly referred to as the labor bond, was signed by the same parties and delivered. That bond contained but one condition, namely, that if the principal and all subcontractors or their assignees

"shall promptly make payment for all labor performed and services rendered in the prosecution of the work, . . . then the above obligation shall be void; otherwise to remain in full force and effect,"

but this language was followed by this proviso:

" . . . Provided, however, that this bond is subject to the following conditions and limitations:

"(a) All persons who have performed labor or rendered services as aforesaid shall have a direct right of action against the Principal and Surety on this bond, which right of action shall be asserted in proceedings instituted in the State in which such labor was performed or services rendered (or where labor has been

performed or services rendered under said Contract in more than one State, then in any such state) . . . ."

It will be observed that under a condition in both bonds it was the duty of the principal to pay for all labor performed, but in the labor bond only was there a provision giving "persons who have performed labor" in the prosecution of the work a direct right of action on the bond against the principal and surety, and because of this appellant contends that it was not the purpose of the parties, by including in the performance bond the provision quoted above, to give a right of action on that bond also to laborers; otherwise, there would have been no reason for executing the labor bond. The correctness of this contention is, he claims, further indicated by the fact that the right to sue under the labor bond is expressly limited to six months from the completion of the work, while this right, under the performance bond, is extended to one year thereafter, the result being that if third parties may sue directly under the performance bond any time within that period, it would render meaningless the six months' limitation of the labor bond. We are unable, however, to see wherein the fact that at the time appellant executed a performance bond, he also signed a labor bond expressly giving those who performed work on the job a direct right of action thereon, has any bearing on the materialman's right to sue on the performance bond, provided it would have had this right in the absence of a labor bond. The materialman's right to bring such an action could not have been affected by the fact that those who performed the labor were given the right to sue on a labor bond. The mere fact that it was one of the four groups of third persons mentioned in the performance bond who must be treated alike—laborers, mechanics, subcontractors and materialmen—does not lead to this result. The materialman and those who performed the labor would

have had the same treatment only if a separate bond had been given for the protection of the former also, and in the absence of one executed for that purpose the question of a second bond for labor had no bearing whatever on its rights. And even if one had been executed for the materialman's special benefit, it would have been necessary that the statute required it before it would have had the effect of limiting one to it in seeking to recover for materials furnished. In fact, the principal authority cited by appellant in support of his contention on this point, *Maryland Casualty Co.* v. *Shafer,* 57 Cal. App. 580, 208 Pac. 192, is a case in which a highway contractor had executed a performance bond and also a separate bond to secure the payment of claims of the character of those involved in that action, the giving of the latter being required by statute. In holding that a suit on the performance bond for the payment of those claims would not lie after the time for completing his claim under the statutory bond had expired, the court said (p. 193):

"Here, in compliance with the contract and the *statute, a separate bond* was given to secure payment of claims of the character under consideration, and it would be unreasonable to hold that the parties intended the faithful performance bond to secure the same claims." (Italics ours.)

■ The other reason urged by appellant why a third party may not sue directly on the performance bond is that the statute requiring such a bond, section 2605, Revised Code of 1928, does not provide that anyone, except the obligees in the bond, may have this right. The pertinent parts of that section read as follows:

" . . . A surety company bond for not less than twenty-five per cent of the full amount of the proposal shall be filed with and become a part of the contract, to be approved by an authorized or appointed attor-

ney-at-law of the agent; . . . twenty-five per cent of all estimates shall be retained by the agent as guarantee of the complete performance of the contract, to be paid to the contractor within sixty-five days after completion, or filing of notice of completion, of the contract, provided the contractor has duly furnished the agent satisfactory receipts for all labor and material bills and waivers of liens from any and all persons holding claims against the work. . . . ''

This language does not say, except in one particular, just what terms the bond to be given by the contractor shall contain, but undoubtedly they are those usual in such cases, and because one cannot gain from it either an express or implied legislative intent to require a bond granting any one other than the state agency to which it was given a right to sue on it, appellant takes the position that it was intended to indemnify that agency only and that the giving of a right of action to third persons was not included. But, notwithstanding this, he points out that there are some authorities which hold that a right of action on performance bonds similar to the one here involved is given to claimants on the theory that the mechanics' lien law does not apply to public buildings and that it is necessary under such circumstances that a remedy in lieu of that law should exist. It is in fact held not in a few instances only but almost universally that public buildings used for public purposes are not subject to a mechanic's lien law unless the legislature has expressly made them so. 40 C. J. 57, par. 19, and cases cited in notes 44 and 45. There are, according to the annotator in 26 A. L. R. 327, two main lines of reasoning why this is true:

''One is that general statutes will not be construed to include the sovereign unless he is expressly mentioned; and the other is that it is against public policy to permit the sale of public property to satisfy me-

chanics' liens, especially if such property is not, under the statutes, subject to sale under execution."

In *Storey & Fawcett* v. *Nampa & Meridian Irr. Dist.*, 32 Idaho 713, 187 Pac. 946, is found this statement (p. 947):

"The general rule, supported not only by reason but by the overwhelming weight of authority, is that a mechanic's lien does not attach to public property unless expressly provided by statute, since such lien would be contrary to public policy and also incapable of enforcement."

In *Hutchison* v. *Krueger*, 34 Okl. 23, 124 Pac. 591, Ann. Cas. 1914C 98, 41 L. R. A. (N. S.) 315, the court said (p. 592):

"The general rule that a lien will not lie against public property devoted exclusively to public use has been almost universally adopted in the various states of the Union . . . "

■ Appellant does not dispute the principle of these decisions but claims that they are without application in Arizona, for the reason that the legislature has made the mechanics' lien law here applicable to public buildings, and he bases his contention upon the language of section 2020, Revised Code of 1928, a part of chapter 46, entitled, "Liens," stating that every person who may furnish material to be used in the construction of "any building" shall have a lien thereon, together with the statement in section 2605, *supra,* that before the state agency pays the "hold-back" of twenty-five per cent., the contractor shall furnish it "waivers of liens from any and all persons holding claims against the work." This last expression does not provide specifically and expressly that the mechanics' lien law shall apply to public buildings or property but does so inferentially only if at all, and in discussing the requirement that such a provision must exist before the court would be justified in hold-

ing that public buildings are brought within the purview of that law, the court, in *Moss Iron Works* v. *Jackson County Court,* 89 W. Va. 367, 109 S. E. 343, 26 A. L. R. 319, said (p. 346):

"Inclusion by reference or interpretation is not sufficient, when the right to perfect a mechanic's lien or materialman's lien upon public buildings is involved. To warrant the creation and enforcement of such a lien against public buildings, the authority must be *specific, positive* and *unmistakable* in its meaning and terms. They must leave open no room for construction or interpretation. . . . To subject property owned and used by the public for the transaction of public business to the mechanics' liens, the authorization must, according to the general, indeed the almost invariable, rule, be *unequivocal,* not *inferential."* (Italics ours).

■ The words, "any building," are, it is true, broad enough to include buildings constructed by and for the use of the public. But to give them this meaning would produce such serious consequences when the property of the public is involved that it should not be done unless the wording of the statute directs it in such explicit language that there is no escape from it. Such was the view of this language expressed by the Supreme Court of Connecticut in determining whether the mechanics' lien law of that state which contained it included public buildings. In *National Fireproofing Co.* v. *Huntington,* 81 Conn. 632, 71 Atl. 911, 129 Am. St. Rep. 228, 20 L. R. A. (N. S.) 261, that court, speaking of the expression, "any building," said:

" . . . they could not be construed to embrace buildings belonging to the state. *State* v. *Kilburn,* 81 Conn. 9, 69 Atl. 1028. Nor do they include any public buildings, belonging to corporations or communities created by the state as governmental agencies for purely public purposes, to defray the cost of which they can freely exercise the power of taxation."

See, also, *Mayrhofer* v. *Board of Education,* 89 Cal. 110, 26 Pac. 646, 23 Am. St. Rep. 451; *A. L. & E. F. Goss Co.* v. *Greenleaf,* 98 Me. 436, 57 Atl. 581; *Hovey* v. *Town of East Providence,* 17 R. I. 80, 20 Atl. 205, 9 L. R. A. 156; *Phillips* v. *Rector etc. of University of Virginia,* 97 Va. 472, 34 S. E. 66, 47 L. R. A. 284; *Young* v. *Falmouth,* 183 Mass. 80, 66 N. E. 419, 97 Am. St. Rep. 418.

██ We are clearly of the view that the performance bond given by appellant was for the protection of those who labored or furnished material on the addition to Taylor Hall, as well as the obligee mentioned therein, and was, therefore, a third party bond. *Knight & Jillson Co.* v. *Castle,* 172 Ind. 97, 87 N. E. 976, 27 L. R. A. (N. S.) 573, and note VIII, page 588. The following excerpt from the annotation in 77 A. L. R., p. 83, is a correct statement of law:

"The right of laborers and materialmen to recover on a bond executed in connection with public works or improvements, where the bond contains a condition for their benefit and is intended for their protection, although the public body is the only obligee named therein, and there is no express provision that such third parties shall have any rights thereunder, is affirmed by the great weight of authority."

The other proposition urged by appellant is that Langston paid appellee $4,454.96 on the materials it furnished him for the Taylor Hall job and, if it was entitled to judgment at all, it should have been awarded the difference between that sum and $6,093.84, the value of those materials, and no more.

The contract and the performance bond were executed in October, 1935, and between November 30th of that year and March 12, 1936, appellee delivered the plumbing materials for this job to the subcontractor who just prior to the first shipment of materials to it was indebted to appellee in excess of $8,000 for ma-

terials for other jobs. Under date of January 10, 1936, appellant gave Langston his check for $5,755.36 as part payment of the amount due him for the plumbing work on the Taylor Hall job, and it was deposited by Langston to his credit in the Arizona Bank at Flagstaff. On the same day Langston drew his check for $3,757.45 in favor of appellee and it was received some days later. On February 10, 1936, Langston received from appellant a check for $4,355.70 as a further payment on the Taylor Hall job and it too was deposited to his credit in the same bank. Four days later or on February 14th he drew his check for $697.51 on that bank in favor of appellee and it too was received within a few days thereafter. Neither of appellant's checks in favor of Langston gave any direction as to how the money should be used and Langston's checks in favor of appellee were enclosed in envelopes and forwarded by mail without any statement or information as to where the funds upon which they were drawn came from or any direction as to how they should be applied, so appellee placed both to the credit of Langston's general or open account, instead of applying them in payment of the material going into the Taylor Hall job. Appellee kept only one account with Langston for the material furnished him on all his contracts, though it so marked the invoices that each disclosed the job to which the material described in it had gone, so by totaling these invoices appellee could ascertain within a short time just how much was due it by Langston for materials furnished him on any particular job.

The general rule is that a debtor who owes his creditor on more than one account may direct to which of them he desires a payment made by him to apply, but if at the time of paying the money he fails to make that application, the creditor has the right to apply it to such of these debts as he sees fit. *Barrett*

v. *Sipp,* 50 Ind. App. 304, 98 N. E. 310. This principle
is so universally accepted that it is not necessary to
support it with extended authorities, and the conten-
tion of appellee is that it was acting in accordance
therewith when it applied the two checks of Langston
to his general account. Appellant does not question
the correctness of this general rule but contends that
it has no application when the facts disclose that the
creditor knew, or had information that put it on notice
of the fact, that the funds had come from a particular
one of several jobs for which it had furnished the
debtor material. When this is true, he strenuously
urges, it is the duty of the creditor, regardless of the
debtor's failure to direct its application, to apply it
in payment of the material that went into the job
from which the money came. "This view," it is said
in *Farr* v. *Weaver,* 84 W. Va. 182, 99 S. E. 395, 397,
"seems to be supported by the weight of authority,"
and there can be no question but that it is equitable
and fair, for to hold otherwise means in its final
analysis that a materialman may knowingly use the
money of one person to discharge the debt of another,
and at the same time leave him in such a position that
he can compel the person whose money it was to pay
it again. That this is not and should not be possible
is shown by the fact that while the statute gives a
materialman a lien on a building for the material he
furnishes for it, except in the case of a public one, yet
when he, with knowledge of their source or of facts
that put him on notice thereof, applies payments
made him by the contractor out of funds received
from the owner of that building, in satisfaction of
other debts of the contractor for materials purchased
for buildings constructed for other owners, merely
because the contractor failed to give him at the time
of payment any direction as to their application, he
by the great weight of authority loses to the extent

of the payment his right to enforce his lien. *Lee v. Storz Brewing Co.,* 75 Neb. 212, 106 N. W. 220; *J. F. Kane & Co.* v. *F. R. Woodbury Lumber Co.,* 121 Wash. 149, 208 Pac. 1107; *Boyer-Van Kuran Lumber & Coal Co.* v. *Colonial Apartment House Co.,* 94 Neb. 180, 142 N. W. 519; *Williams* v. *Willingham-Tift Lumber Co.,* 5 Ga. App. 533, 63 S. E. 584; *Petersen* v. *Shain,* 4 Cal. Unrep. 122, 33 Pac. 1086; *Flexner University School* v. *Strassel Gans Paint Co.,* (Ky.) 112 S. W. 686; *Clow & Sons* v. *Goldstein,* 147 Ill. App. 571; *Mills* v. *Olsen,* 43 Mont. 129, 115 Pac. 33; *Sioux City Foundry & Mfg. Co.* v. *Merten,* 174 Iowa 332, 156 N. W. 367, L. R. A. 1916D 1247, and note at page 1254, L. R. A. 1916D.

In *Farr* v. *Weaver, supra,* the court, in discussing this question, used the following language (p. 397):

" . . . His duty to apply them on a particular account arises when he has notice that they have been paid to the contractor by the owner of the building into which the materials went for the purpose of discharging the owner's indebtedness therefor. This view seems to be supported by the weight of authority. (Citing cases.) There are some authorities which apparently take the contrary view. Most of them are distinguishable upon the facts. We have carefully examined all of the cases to which we have access, and we find that, in most instances where either the debtor or creditor was allowed to make application of such payments to another debt than the one against the property the owner of which furnished the money, some of the elements above indicated were lacking, or at least it does not appear from the opinions in most of these cases that the materialman or subcontractor receiving the money had notice of the source from which it came, and the purpose for which it was paid to the contractor. . . ."

The rule has been recognized in two different instances by this court, and while in both of them the materialman was permitted to recover it was due to

the fact that the evidence showed that when the funds were paid him by the contractor he had no knowledge of the source of the funds or of facts that would have put him on notice thereof. In *Stolaroff* v. *Bassett Lumber Co.*, 21 Ariz. 490, 190 Pac. 81, the court, speaking through Justice BAKER made this statement (p. 496):

" . . . In order to deprive the Bassett Lumber Company of the right to apply the payment to the Itule account, the company must have known that it was receiving Stolaroff's money, or the facts must have been sufficient to put the company on notice of some equity in Stolaroff." ,

In *Watson* v. *Murphey*, 36 Ariz. 377, 285 Pac. 1037, the following language was used (p. 381):

"It is also contended that Murphey should have credited payments made to him by Tomlinson during the construction period on the Watson job and not on open account. If such payments had been made to Murphey with Watson's check, this claim, under the rule announced in *Stolaroff* v. *Bassett Lumber Co.*, 21 Ariz. 490, 190 Pac. 81, might have some force, but the payments were all made in cash. Murphey 'had no knowledge that the money paid to him was furnished by the owner' and no notice that Watson had any equity in such money."

The fact that the building in this case was one upon which the statute gave no lien did not place appellee in any better position to recover for the material it furnished than it would have occupied had a lien existed. And this being true, its right to proceed against appellant on his bond for the full sum of $6,093.84, after he had, to the knowledge of appellee, paid thereon $4,454.96, was no greater than it would have been to foreclose its lien for the total sum had the statute provided for one. The bond, in so far as it guaranteed payment of the material, took the place of a lien, and the principal thereon was in the same

situation, so far as payment for the material was concerned, as the owner of a private building would have been. The materialman could hold him responsible on the bond to the same extent he could the owner of a building upon which he had a lien, and no further.

The controlling factor, therefore, is whether appellee knew when it applied the money represented by the two checks of Langston that it came from Webb out of the Taylor Hall job. The court made no findings and we do not know upon which theory it based its judgment, whether it followed the general rule, or the exception thereto which necessitated a finding that appellee had no knowledge of the source of the funds. It would appear, however, from a statement by the court in overruling objections to certain questions propounded by appellant's counsel to appellee's cashier, relative to its knowledge of the source of the funds, that the court felt that appellee was within its rights in applying them according to the general rule and that its knowledge of where they came from was, in the absence of directions by Langston, immaterial. This renders necessary an examination of the evidence for the purpose of ascertaining whether appellee knew the source of the funds or had information that should have put it on notice of that fact.

Gignac, appellee's cashier, who had charge of its accounts testified, it is true, that he did not know where the money came from, but notwithstanding this it is contended by appellant that the evidence shows that he did have this knowledge or at least that he had information that should have put him on notice thereof, and in support of this contention he cites, among others, the following facts: On January 1, 1936, Langston owed appellee $10,316.50 and about that date Gignac called him by long distance and asked for a payment on account and Langston answered that he had

not yet received any money. Gignac then inquired if he had not been paid anything from the Del Webb job and he answered no but that he would receive some from that contract in the near future. The same date Gignac called Webb at his Phoenix office and asked how much was coming to Langston on the Taylor Hall job and Webb gave him the figures, stating that a payment would be made Langston between the 10th and the 15th of the month, when the estimates of the work done were completed and received. A few days after these conversations with Webb and Langston, or on January 6th, Gignac wrote Langston, stating that he understood he would receive between $11,000 and $12,000 during January, $8,000 of which would be from Del Webb on the Taylor Hall job and that he expected a good portion or all of this to be turned over to appellee to be applied on his account. After drawing his check in favor of Langston for $5,755.36 on January 10th and mailing it to him, Webb informed Gignac who called him again about the matter that Langston's check had been sent to him. A few days after January 10th appellee received Langston's check for $3,757.45 and while Gignac said he was not necessarily expecting payments by Langston from the Webb contract, since he was working on other jobs at the time, yet he stated the Taylor Hall job was the biggest one Langston had, that most of the supplies going to him were for that job, that in his conversations with Langston he asked nothing about money from other jobs, and that the Taylor Hall job or Webb was the only person from whom he was after Langston to get money. He admitted that he knew Langston's check in favor of appellee was for a smaller sum than Webb had paid him and did not deny that he had a conversation with Langston after receiving his check in which he asked him why appellee did not get more of Webb's check.

About February 1st Gignac called Webb again, inquiring as to Langston's account and, as in January, was told when he would receive another payment, and following the receipt of estimates in February Webb mailed Langston a check for $4,355.70 and Langston, under date of February 14th, forwarded appellee his check on the Arizona Bank at Flagstaff for $697.51. Both checks to appellee were drawn on funds paid Langston by Webb, though Gignac admitted that no part of them was applied in payment of his account for material that went into the Taylor Hall job but were used solely to satisfy what Langston owed appellee on other older jobs with which Webb had no connection. Gignac was continually after Langston for money from the Taylor Hall job to be applied on his account.

No one can read this evidence without feeling that Gignac did know that the money, or practically all of it, paid appellee by Langston in January and February, 1936, came from the Taylor Hall job, or at least that the information it did have should have put it on notice of that fact. If Webb's check to Langston had been endorsed and turned over to appellee, there would have been, under the Stolaroff and Watson cases cited above, no question of appellee's knowledge as to the source of the funds and of its duty to apply accordingly, and this principle is just as applicable whether that information is acquired in that or some other manner. This being true, it was, under the authorities, the duty of appellee to apply the $4,454.96 received from Langston from the Taylor Hall job in payment of the material that went into it and due to its default in this respect it has forfeited its right to enforce payment from Webb on his bond, that is, to the extent of the payments made. Nothing else would be equitable. It is utterly unthinkable that appellee, knowing that this money came from Webb, or

having information that should have put it on notice of that fact, should be permitted to use it to pay somebody else's debt and then compel Webb by suit on his bond to pay it a second time. Some authorities go so far as to hold that even if the materialman does not know the source of the funds at the time they are paid he should, in fairness to the person who has paid them, be required to apply them properly later on, when the true facts appear, since to do this means no reduction in the debtor's credit but only a change of book entries. *Sioux City Foundry & Mfg. Co.* v. *Merten, supra; Williams* v. *Willingham-Tift Lumber Co., supra.*

 The court allowed interest on the amount found due to be computed from the day the complaint was filed until the judgment was rendered, and appellee cross assigns error on this, claiming that it was entitled to interest from the day the respective items of the account became due. Appellee did not appeal and for this reason appellant contends that its cross assignment is not before us. This court has on several occasions considered cross assignments in the absence of an appeal by appellee (*Murphey* v. *Brown,* 12 Ariz. 268, 100 Pac. 801; *Cashion* v. *Bank of Arizona,* 30 Ariz. 172, 245 Pac. 360) and in others refused to "take notice of an appellee's argument in his brief that error was committed to his prejudice when he has not assigned error," where it was not fundamental. *Steinfeld & Co.* v. *Tew,* 35 Ariz. 147, 274 Pac. 1047; *Barth* v. *A. & B. Schuster Co.,* 25 Ariz. 546, 220 Pac. 391. The action of the court was proper in both instances, for the practice of requiring cross assignments by appellee is almost universal. The court in *Cain* v. *Bonner,* 108 Tex. 399, 194 S. W. 1098, 3 A. L. R. 874, said (p. 1099):

"Certain rulings by the trial court adverse to the defendants were made by them the subject of cross

assignments of error in the Court of Civil Appeals. We think they were entitled to have them there considered, though they did not prosecute an appeal.''

 There would seem to be no question but that appellee was entitled to interest from Langston from the date the account became due, there being no dispute as to the amount. *Atlantic Com. Co.* v. *Noe et al.,* 47 Ariz. 123, 53 Pac. (2d) 1088. And since it was a condition of the performance bond that appellant

''shall promptly pay all laborers, mechanics, subcontractors, and materialmen, and all persons who shall supply such laborers, mechanics or subcontractors with material, supplies, etc.,''

his obligation in this respect would appear to be as broad as Langston's. The fact that the latter was the primary debtor for the plumbing material did not relieve appellant upon his default from paying the interest due by him any more than it did the principal. The interest should have been allowed on the amount unpaid by appellant, that is, $1,638.88, to be calculated from the dates the items representing that sum became due.

On May 21, 1937, immediately following the overruling of appellant's motion for a new trial, he paid the judgment and had it satisfied of record, and on June 17th following perfected an appeal therefrom. Some time after service of his opening brief appellee filed a motion asking that the appeal be dismissed for two reasons: First, that the voluntary payment and satisfaction of the judgment was an acquiescence therein and, hence, constituted a waiver and estoppel of his right to appeal; second, that both Langston and the Massachusetts Bonding and Insurance Company were necessary parties to the appeal but neither had joined therein. The court declined to grant the motion

but passed it until the appeal should be considered on its merits.

 The motion was without merit. The following statement of the rule in Freeman on Judgments, volume 2, fifth edition, page 2419, paragraph 1165, is in line with the great weight of authority:

"One against whom a judgment is entered, if he fails to satisfy it, must expect to see his property seized and sold at a sacrifice, and it is difficult to conceive how his payment of the judgment can give rise to any estoppel against his seeking to avoid it for error. Nevertheless there are cases deciding that one paying a judgment against him precludes all appeal therefrom. The better view, we think, is that though execution has not issued, the payment of a judgment must be regarded as compulsory, and therefore as not releasing errors, nor depriving the payor of his right to appeal, unless payment be by way of compromise and settlement or under an agreement not to appeal or under circumstances leaving only a moot question for determination. . . . "

See 2 R. C. L. 64, par. 47; 3 C. J. 675, 676, par. 550; *Dakota County* v. *Glidden,* 113 U. S. 222, 5 Sup. Ct. 428, 28 L. Ed. 981; *Patterson* v. *Keeney,* 165 Cal. 465, 132 Pac. 1043, Ann. Cas. 1914D, 232; *Hogue* v. *McAllister,* 122 Wash. 347, 210 Pac. 671.

 Had appellant not given a *supersedeas* bond or in lieu thereof paid the judgment, his property, including equipment, could have been seized and sold. Hence, it cannot be said that in satisfying the judgment to protect himself from such a contingency he acted voluntarily or accepted benefits under the judgment. It follows, therefore, that his action did not constitute either a waiver or an estoppel.

 Appellant's right to appeal was in no way affected by the fact that the other two defendants did not join in it. Any person aggrieved by a judgment may, under section 3658, Revised Code of 1928, ap-

peal from it, and this right is in no way affected by the attitude of his co-defendants or plaintiffs, whichever it happens to be. Appellant's surety was not a necessary party because it was liable only in case of and to the extent he as principal was, hence the modification of the judgment as to appellant, the principal, is a modification as to the surety, even though it is not a party to the appeal. Langston, the primary debtor, has received the benefit of appellant's payments and his account with appellee remains satisfied to that extent. The modification of the judgment as to appellant does not affect in the slightest Langston's liability to appellee for the balance of his accounts.

The judgment should have been for $1,638.88, the difference between the $6,093.84, the total amount due for material furnished Langston for the Taylor Hall job, and $4,454.96, the sum paid thereon by Langston out of moneys coming from that job. It is, therefore, modified by eliminating from it $4,454.96, and the interest on the $1,638.88 is allowed from the date the items composing it became due rather than from the date the action was filed, and with these modifications the judgment is hereby affirmed.

ROSS and LOCKWOOD, JJ., concur.