**R.J. WILLIAMS COMPANY, Richard J. Williams and Fireman's Fund Insurance Company, Plaintiffs-Appellees,**

v.

**FORT BELKNAP HOUSING AUTHORITY, Defendant-Appellant.**

No. 82–3636.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 7, 1983.

Decided Oct. 31, 1983.

Bruce P. Babbitt, Ferguson & Burdell, Seattle, Wash., for plaintiffs-appellees.

Francis X. Lamebull, Lamebull Law Firm, Harlem, Mont., for defendant-appellant.

Before WRIGHT, CHOY, and NELSON, Circuit Judges.

CHOY, Circuit Judge:

The Fort Belknap Housing Authority ("Housing Authority") is an entity created by tribal law of the Fort Belknap Indian community and established in accordance with 42 U.S.C. § 1437 et seq. and 24 C.F.R. pt. 805. Its purpose is to administer housing projects for the tribe. In connection with a contract dispute, a contractor sued the Housing Authority and was awarded damages in excess of $98,000. The Housing Authority now appeals, claiming the district court had no subject matter jurisdiction over the case. We find that resolution of this question involves a matter not for us to decide, and accordingly reverse and remand.

## I. Statement of Facts

R.J. Williams Construction Company is a partnership of two Washington residents, Tom Williams and Richard J. Williams. Williams Brothers Building Contractors ("Williams Brothers") is a joint venture between two Montana corporations. Richard Williams serves as president of Williams Brothers.

In October 1976, Williams Brothers contracted with the Housing Authority to build 50 single-family houses. As part of the contract, Williams Brothers agreed to complete or correct deficiencies in its work or materials that appeared within one year of completion of the project.

The project was completed in early 1978. Shortly afterward, the Housing Authority presented Williams Brothers with lists detailing deficiencies it claimed Williams Brothers was obligated to correct under the contract. Williams Brothers corrected some of these deficiencies but refused to fix others that it contended were due to defective specifications, tenant abuse, or other causes that relieved it of its obligation to repair. Negotiations failed to resolve the conflict, and those alleged deficiencies remained uncorrected.

On March 24, 1980, on application of the Housing Authority, a tribal court judge issued a writ of attachment leading to the seizure of approximately $50,000 worth of equipment, materials, and supplies belonging to Richard J. Williams, R.J. Williams Co., and Williams Brothers. The seized items had been stored in a tribal warehouse and were being used to complete work on other contracts with the Housing Authority.

At the time of the attachment, the jurisdictional ordinance applicable to the tribal court read:

> The Fort Belknap Community Court shall have jurisdiction of all Civil suits wherein the defendant is a member of the Fort Belknap Indian Community, and of all other Civil suits between members and non-members which are brought before the Court by stipulation of both parties.

Fort Belknap Law and Order Code ch. I, § 14.1 (1970).[1] Richard Williams and R.J. Williams Co. challenged the tribal court's

---

[1] On August 5, 1980, the tribe amended its jurisdictional statute. Fort Belknap Ord. No. 2–80 (1980). The Housing Authority asserts that this ordinance vested the tribal court with jurisdiction over non-Indians transacting business within the reservation.

jurisdiction, but the court has never ruled on the challenges.

In September 1980, appellees filed the present action in federal district court seeking return of their property and damages arising out of the alleged wrongful attachment. The appellees named the tribal court as well as the Housing Authority as a party defendant, but the tribal court was subsequently dismissed from the suit. The Housing Authority counterclaimed, alleging breach of contract.

The district court held that it had both diversity and federal question jurisdiction over the subject matter. It then turned to the merits and found that the tribal court had no jurisdiction over Richard Williams and R.J. Williams Co., and that the attachment denied appellees due process of law. The court awarded damages for conversion, which included appellees' expenses of pursuing their property, the cost of procuring substitute materials, and attorneys' fees. The award exceeded $98,000. The court also awarded the Housing Authority $5,000 on its counterclaim for breach of contract.

## II. *Federal Question Jurisdiction*

■ The general rule is that a court may take jurisdiction if it must make determinations of law in order to determine the existence of a federal claim. *Bell v. Hood,* 327 U.S. 678, 682–85, 66 S.Ct. 773, 776–77, 90 L.Ed. 939 (1946); *Babbitt Ford, Inc. v. Navajo Indian Tribe,* 710 F.2d 587, 591 (9th Cir.1983). We note that appellees' asserted federal claims are all challenges to tribal government action, but the tribal court is not party to the suit. To reach the merits of appellees' claims, we assume without deciding that the Housing Authority, as an agency of the tribal government, can be attacked under the statutes which appellees urge are applicable. We conclude that, although the district court properly exercised jurisdiction under 28 U.S.C. § 1331, appellees have stated no federal claim for which relief can be granted.

### A. *Constitution of the United States*

■ The district court awarded damages to the appellees because the attachment and seizure of their property occurred "without the constitutional requirements of due process." However, Indian tribes are "separate sovereigns pre-existing the Constitution," and are thus unconstrained by constitutional limitations on federal or state authority. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56 & n. 7, 98 S.Ct. 1670, 1675 & n. 7, 56 L.Ed.2d 106 (1978). Appellees' claims therefore cannot arise under the Constitution.

### B. *The Indian Civil Rights Act*

■ Congress does have "plenary authority to limit, modify or eliminate the powers of local self-government which tribes otherwise possess." *Santa Clara Pueblo,* 436 U.S. at 56–57, 98 S.Ct. at 1675–1676. Congress has exercised that authority by enacting the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301–1341. Although § 202(8) of the Act, 25 U.S.C. § 1302(8), provides that no Indian tribe in exercising powers of self-government shall deprive any person of liberty or property without due process of law, we have recognized that the *Santa Clara Pueblo* holding "foreclosed any reading of the [Act] as authority for bringing civil actions in federal court to request … forms of relief [other than habeas corpus]." *Snow v. Quinault Indian Nation,* 709 F.2d 1319, 1323 (9th Cir.1983), *petition for cert. filed,* 52 U.S.L.W. 3310 (U.S. Oct. 11, 1983) No. 83–595; *accord Boe v. Fort Belknap Indian Community,* 642 F.2d 276, 278–79 (9th Cir.1981); *Trans-Canada Enterprises, Ltd. v. Muckleshoot Indian Tribe,* 634 F.2d 474, 477 (9th Cir.1980). *Contra Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes,* 623 F.2d 682 (10th Cir.1980), *cert. denied,* 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981).

### C. *42 U.S.C. § 1983*

Appellees argue that they have stated a claim under 42 U.S.C. § 1983, and therefore that the district court had jurisdiction under 28 U.S.C. § 1343(3). This argument has no merit.

First, no action under 42 U.S.C. § 1983 can be maintained in federal court for persons alleging deprivation of constitutional rights under color of tribal law. Indian tribes are separate and distinct sovereignties, *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978); *see United States v. Wheeler,* 435 U.S. 313, 331, 98 S.Ct. 1079, 1090, 55 L.Ed.2d 303 (1978), and are not constrained by the provisions of the fourteenth amendment. *Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe,* 370 F.2d 529, 533 (8th Cir.1967); *see Talton v. Mayes,* 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896); *Martinez v. Southern Ute Tribe,* 249 F.2d 915, 919 (10th Cir.1957), *cert. denied,* 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed.2d 1067 (1958). As the purpose of 42 U.S.C. § 1983 is to enforce the provisions of the fourteenth amendment, *Monroe v. Pape,* 365 U.S. 167, 171, 81 S.Ct. 473, 475, 5 L.Ed.2d 492 (1961); *Thompson v. New York,* 487 F.Supp. 212, 220 (N.D.N.Y.1979), it follows that actions taken under color of tribal law are beyond the reach of § 1983, and may only be examined in federal court under the provisions of the Indian Civil Rights Act.

Appellees, however, seek to characterize the seizure as occurring under color of Montana law by pointing to a tribal ordinance which reads:

In all civil cases, the [tribal] Court shall apply any laws of the United States, any regulations of the Interior Department, any ordinance of the Community not prohibited by such Federal laws, or customs of the Fort Belknap Indian Community which might be applicable. Any matters that are not covered by the applicable ordinances or Federal laws and regulations, shall be decided by the court in accordance with the laws of the State or the customs of the Reservation in which the matter in dispute may lie.

Fort Belknap Law and Order Code ch. I, § 14.5 (1970). This argument is unmeritorious. The tribe has chosen to adopt the framework of state law to cover gaps in the tribal code. In doing so, however, it has not relinquished its own sovereignty, and it has not involved the state in any way in the enforcement or interpretation of tribal law. *Nelson v. Dubois,* 232 N.W.2d 54, 57–58 (N.D.1975); *see Wauneka v. Campbell,* 22 Ariz.App. 287, 291, 526 P.2d 1085, 1089 (1974).

III. *Diversity Jurisdiction*

In order for a federal court to have diversity jurisdiction under 28 U.S.C. § 1332, the parties must be of diverse citizenship under 28 U.S.C. § 1332(a), and the courts of the state in which the federal court sits must be able to entertain the action, *Woods v. Interstate Realty Co.,* 337 U.S. 535, 538, 69 S.Ct. 1235, 1237, 93 L.Ed. 1524 (1949). In addition, in cases involving Indians diversity jurisdiction is precluded when state jurisdiction would infringe upon the right of the Indians to self-government. *Littell v. Nakai,* 344 F.2d 486, 489 (9th Cir.1965); *see Begay v. Kerr-McGee Corp.,* 682 F.2d 1311, 1317 (9th Cir.1982). We think that this case involves a genuine issue of tribal ordinance construction which must be left to the tribal court for resolution.

A. *Diversity of Citizenship*

The initial plaintiffs in the federal suit were Richard J. Williams and R.J. Williams Construction Co., both residents of Washington for diversity purposes. The defendant Housing Authority is a corporation with its principal place of business in Montana.[2] Williams Brothers is a citizen of Montana for diversity purposes, but it was joined on a compulsory counterclaim so diversity jurisdiction is not destroyed by that fact. *See*

---

**2.** The Housing Authority is an incorporated entity and as such is a Montana citizen for diversity purposes. *R.C. Hedreen Co. v. Crow Tribal Hous. Auth.,* 521 F.Supp. 599, 602–03 (D.Mont.1981). The issue of citizenship for this purpose is often entangled with the issue of sovereign immunity. Any sovereign immunity the Housing Authority had, however, was waived through operation of Fort Belknap Ord. No. 2–77, art. V, § 2 (1977), a "sue and be sued" clause in the ordinance establishing the Housing Authority. *See also* 24 C.F.R. §§ 805.-108–.109 & app. I, art. V, § 2.

*Union Paving Co. v. Downer Corp.,* 276 F.2d 468, 471 (9th Cir.1960); *H.L. Peterson Co. v. Applewhite,* 383 F.2d 430, 433 (5th Cir. 1967). Thus, complete diversity does exist.

### B. *Interference with Tribal Self-Government*

 States which have not assumed general civil jurisdiction over Indian tribes play only a limited role in the resolution of disputes on the reservation.[3] In *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), a non-Indian operating a general store on an Indian reservation brought suit in Arizona state court to collect for goods sold on credit to a tribal member. The Supreme Court held that the Arizona state court had no jurisdiction over the subject matter, since Congress did not grant the court jurisdiction expressly and state jurisdiction would infringe upon "the right of reservation Indians to make their own laws and to be ruled by them." *Id.* at 220, 79 S.Ct. at 270.

In *Littell v. Nakai,* 344 F.2d 486 (9th Cir.1965), this court held that *Williams* also had an impact on diversity actions brought in federal court. After we concluded that Littell would have been precluded from suing in state court by *Williams v. Lee,* we noted that a federal court sitting in diversity operates as an adjunct to a state court and should also be precluded from entertaining the action. *Id.* at 489 (quoting *Woods v. Interstate Realty Co.,* 337 U.S. 535, 538, 69 S.Ct. 1235, 1237, 93 L.Ed. 1524 (1949)). We concluded that federal courts would be divested of diversity jurisdiction whenever the dispute involved the exercise of the tribe's responsibility for self-government. *Id.* at 489; *see Organized Village of Kake v. Egan,* 369 U.S. 60, 67–68, 82 S.Ct. 562, 566–567, 7 L.Ed.2d 573 (1962).

A tribe's interest in self-government could be implicated in one of two ways.

First, if a state or federal court resolves a dispute which was within the province of the tribal courts or of other nonjudicial law-applying tribal institutions, that court would impinge upon the tribe's right to adjudicate controversies arising within it. *Fisher v. District Court,* 424 U.S. 382, 387–88, 96 S.Ct. 943, 946–47, 47 L.Ed.2d 106 (1976) (per curiam); *see Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 65–66, 98 S.Ct. 1670, 1680–1681, 56 L.Ed.2d 106 (1978). Second, if the dispute itself calls into question the validity or propriety of an act fairly attributable to the tribe as a governmental body, tribal self-government is drawn directly into the controversy. *Littell,* 344 F.2d at 490.

We have recognized that the tribal court is generally the exclusive forum for the adjudication of disputes affecting the interests of both Indians and non-Indians which arise on the reservation. *Snow v. Quinault Indian Nation,* 709 F.2d 1319, 1323 (9th Cir.1983) (quoting *Santa Clara Pueblo,* 436 U.S. at 65, 98 S.Ct. at 1680), *petition for cert. filed,* 52 U.S.L.W. 3310 (U.S. Oct. 11, 1983) No. 83–595. Here, however, at the time of the dispute there is some question of whether the tribe had exercised its right to assume its exclusive jurisdiction. Fort Belknap Law and Order Code ch. I, § 14.1 (1970), states that the tribal court has jurisdiction to hear suits in which the "defendant is a member of the Fort Belknap Indian Community." The word "member" is not precisely defined in the ordinance, and there remains a genuine question as to whether the Housing Authority is contemplated within the jurisdictional statute.[4] Interpretation of a tribal ordinance is one of the duties of a tribal court. We are therefore constrained to reverse and remand. The tribal court must first determine its jurisdiction in the matter.

Because of our disposition on this issue, it is unnecessary to decide whether the is-

---

**3.** Montana has never assumed general civil jurisdiction over the Indian tribes within its boundaries pursuant to 25 U.S.C. § 1322 or any predecessor statute. The states that have done so are listed in 28 U.S.C. § 1360.

**4.** The Housing Authority argues that the 1970 code was amended by Fort Belknap Ord. No. 7–77 (1977) and retroactively by Ord. No. 2–80 (1980) so as to give the tribal court jurisdiction. That argument is also more appropriately addressed to the tribal courts for resolution.

suance of the writ of attachment was fairly attributable to the tribe as a governmental body.[5]

We emphasize that the Indians in the Fort Belknap community are, and always have been, entitled to assume exclusive jurisdiction over civil controversies within the reservation. However, if the dispute itself does not implicate the tribal government and the tribe has decided not to exercise its exclusive jurisdiction, it does not follow that the state courts are without power to resolve a controversy occurring within the state but on a reservation. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973); *Organized Village of Kake v. Egan,* 369 U.S. 60, 75, 82 S.Ct. 562, 570, 7 L.Ed.2d 573 (1962); *see Fisher v. District Court,* 424 U.S. 382, 387–88 & nn. 11–12, 96 S.Ct. 943, 946–47 & nn. 11–12, 47 L.Ed.2d 106 (1976) (per curiam).[6] By the same token, the federal courts sitting in diversity are not divested of jurisdiction when the tribe has not itself manifested an interest in adjudicating the dispute. *See* Note, *State Jurisdiction Over Indians as a Subject of Federal Common Law: The Infringement-Preemption Test,* 21 Ariz.L.Rev. 85, 103 (1979); *see also id.* at 101.

### C. *Willingness of State to Entertain the Action*

We think that the decisions of the Montana Supreme Court lead to the conclusion that Montana state courts would assume jurisdiction over controversies which the tribal courts decline to decide themselves. In *State ex rel. Iron Bear v. District Court,*

162 Mont. 335, 512 P.2d 1292 (1973), a trial court had determined that it lacked jurisdiction to adjudicate a divorce action between two members of the Fort Peck reservation. A tribal ordinance, however, had been interpreted by the tribal court as ceding jurisdiction over divorce matters. The state supreme court issued a writ of mandamus ordering the district court to take jurisdiction, determining that the exercise of state jurisdiction would not interfere with tribal self-government and that the tribal court had not exercised its jurisdiction so as to preempt state jurisdiction. *Accord Bad Horse v. Bad Horse,* 163 Mont. 445, 450, 517 P.2d 893, 896, *cert. denied,* 419 U.S. 847, 95 S.Ct. 83, 42 L.Ed.2d 76 (1974);[7] *see also Poitra v. Demarrias,* 502 F.2d 23, 29 n. 10 (8th Cir.1974).

### IV. *Significant Contacts Outside the Reservation*

Appellees point out, as an alternative argument for finding diversity jurisdiction, that Indians going beyond reservation boundaries generally have been held subject to state law. *Mescalero Apache Tribe,* 411 U.S. at 148–49, 93 S.Ct. at 1270–71; *Organized Village of Kake,* 369 U.S. at 75, 82 S.Ct. at 570. The Supreme Court of Montana has held that Montana state courts may assert jurisdiction over a transaction involving an Indian party when that transaction involved "significant contacts with the state outside reservation boundaries." *Crawford v. Roy,* 176 Mont. 227, 230, 577 P.2d 392, 393 (1978). The Montana courts have accordingly asserted jurisdiction over an action to collect on a contract, where

---

5. We think it appropriate to follow the Supreme Court's pronouncements on the subject of state action in deciding this question. *See, e.g., Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936–40, 102 S.Ct. 2744, 2754–56, 73 L.Ed.2d 482 (1982) (discussing the question of whether conduct is "fairly attributable to the state").

6. Montana was admitted to statehood in 1889 on condition that it disclaim all right and title to jurisdiction over Indian lands. Act of Feb. 22, 1889, ch. 180, § 4, 25 Stat. 676, 677. Such a disclaimer was written into the state constitution. Mont.Const. art. I. However, these disclaimers do not force Montana to relinquish

governmental or regulatory authority over the lands, only proprietary authority. *State ex rel. Iron Bear v. District Court,* 162 Mont. 335, 344, 512 P.2d 1292, 1296 (1973); *see White Mountain Apache Tribe v. Arizona,* 649 F.2d 1274, 1280 (9th Cir.1981).

7. The tribal court subsequently interpreted the ordinance in question so as to give itself jurisdiction over divorce matters. Relying on that fact, the Montana Supreme Court overruled *Bad Horse* but adhered to its reasoning in *Iron Bear. In re Marriage of Limpy,* 636 P.2d 266, 269 (Mont.1981).

two non-Indians living off the reservation were hired by an Indian attorney to perform services both on and off the reservation, *id.,* and an action to collect on a loan made off the reservation to an Indian, *Little Horn State Bank v. Stops,* 170 Mont. 510, 555 P.2d 211 (1976), *cert. denied,* 431 U.S. 924, 97 S.Ct. 2198, 53 L.Ed.2d 238 (1977).

The federal district court held the "significant contacts" rationale applicable in a case similar to this one, *R.C. Hedreen Co. v. Crow Tribal Housing Authority,* 521 F.Supp. 599, 606 n. 4 (D.Mont.1981).[8] We disagree with the court's analysis. In determining the locus of a contract dispute, courts generally look to (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the place of residence of the parties, evaluating each factor according to its relative importance with respect to the dispute. Restatement (Second) of Conflict of Laws § 188(2) (1971). When a contract concerns a specific physical thing, such as land or a chattel, the location of the thing is regarded as highly significant. *Id.* § 188 comment e; *see also id.* §§ 189–191. Here, as in *Hedreen,* the contract involved housing to be built on the reservation, to be occupied by reservation members and paid for by an agency representing the tribe. We think these factors determine the locus of the dispute, although workers, supplies, and the construction bond would have to come in from off the reservation. There were thus no "substantial activities giving rise to a dispute" arising outside the reservation. *In re Bertelson,* 617 P.2d 121, 125 (Mont.1980). Thus, the "significant contacts" test is not met here.

## V. *Conclusion*

We hold that the plaintiffs have not stated a federal claim for which relief can be

granted, and any determination of whether diversity jurisdiction exists will have to await a decision by the Fort Belknap Community Court on jurisdiction over this controversy. Accordingly, the judgment of the district court is reversed.

REVERSED and REMANDED.

---

8. The district court pointed to the following facts:

 (1) the contracts were made with non-Indian entities residing off the reservation, (2) they contemplated the procurement of supplies and labor off the reservation, (3) bids for the work were solicited off the reservation, (4) the plaintiff executed the contracts off the reservation, and (5) the bond essential to the contracts was procured and signed off the reservation.

521 F.Supp. at 606 n. 4.