720 P.2d 499

**SMITH PLUMBING COMPANY, INC., an Arizona corporation, dba White Mountain Supply Company, Plaintiff/Appellant,**

v.

**AETNA CASUALTY & SURETY COMPANY, a Connecticut corporation, Defendant/Appellee,**

**White Mountain Apache Tribe, dba Apache Development Enterprise, Defendant/Intervenor/Appellee.**

No. 17691–PR.

Supreme Court of Arizona,
En Banc.

May 28, 1986.
Reconsideration Denied July 15, 1986.

Killian, Legg, Nicholas & Fischer by Charles W. Wirken, Mesa, for plaintiff/appellant.

Robert C. Brauchli, Pinetop, for defendants/appellees.

HOLOHAN, Chief Justice.

This matter arises in this court on the petition by Aetna Casualty & Surety Co. and the White Mountain Apache Tribe doing business as Apache Development Enterprise to review a decision of the Court of Appeals. The appellate court had ruled that the superior court had jurisdiction over the claim by Smith Plumbing Co., Inc., an Arizona corporation, against Aetna, a surety on a performance bond for the White Mountain Apache Tribe's Enterprise. (*Smith Plumbing Co., Inc. v. Aetna Casualty & Surety Co.*, 149 Ariz. 545, 720 P.2d 520 (App.1984)). We granted review to determine whether the exercise of jurisdiction by the superior court in this case violated the Tribe's right of sovereign immunity or interfered with the exclusive jurisdiction of the tribal court.

## FACTS

The facts necessary to the decision of this case are not in dispute. In 1963 the Tribal Council of the White Mountain Apaches created the White Mountain Apache Housing Authority to receive financial assistance from the United States Department of Housing and Urban Development (HUD) to build low income housing on the reservation. The Authority is an Indian corporation created by the Tribe and granted the necessary corporate powers to contract and to borrow money for the purpose of developing housing on the reservation. In its formation ordinance the Au-

thority was also granted the power to waive immunity from suit for its obligations.[1] In 1968 the Tribe created the White Mountain Apache Development Enterprise to undertake construction projects on the reservation. The Enterprise is in reality a development enterprise of the White Mountain Apache Tribe. The Housing Authority contracted with the Enterprise in 1978 to build four low income housing projects financed with HUD funds. The Enterprise was to act as general contractor for the projects.

Pursuant to HUD regulations, the Enterprise, as general contractor, obtained a performance-payment bond for each construction contract from Aetna. The provisions of the bonds are on standard form documents prepared by HUD; they bind the Enterprise and its surety Aetna to the Authority, as owner of the projects, in the amount of the original contract sums. The bonds contain the standard conditions guaranteeing the payment of wages and materialmen on the projects.

The Enterprise entered into a subcontract with G, S & D Plumbing, a private business not connected with the Tribe, to supply all plumbing materials and labor for installation in the housing projects. Smith, a wholesale plumbing supplier in Lakeside, Arizona, outside the boundaries of the reservation, supplied G, S & D with plumbing supplies for the housing projects. Smith sold plumbing supplies to G, S & D on open account for a number of months, but Smith alleges that G, S & D stopped making payments on the account in June of 1980 leaving a balance owed of over $75,000. Smith claims the amount due is for material furnished to G, S & D for the housing project.

Smith initially filed suit in the United States District Court against G, S & D, the Enterprise and Aetna, but the federal court dismissed the action for lack of subject matter jurisdiction. Smith then filed a complaint in the superior court against the Authority on the basis of unjust enrichment and against the Authority and Aetna on the performance-payment bonds.

Aetna and the Authority filed a motion to dismiss the complaint, which the trial court denied. The Enterprise thereafter moved to intervene in the action as an indispensable party pursuant to Ariz.R.Civ.P. 24, 16 A.R.S., asserting its status as the principal obligor on the bonds and its obligation to indemnify Aetna and the Authority for any judgment obtained against them. Smith did not oppose the Enterprise's motion, and the trial court granted it. Some months later, because Smith had never completed service of process upon the Authority, Smith filed a Notice of Dismissal as to the Authority only. Aetna and the Enterprise then filed a motion to dismiss, which the trial court granted, holding that it lacked jurisdiction over the Tribe and its agencies and that the surety could not be sued "directly."

Smith appealed the trial court's order dismissing the action against both Aetna and the Enterprise, but on appeal Smith sought relief only against Aetna. Concluding that Smith had waived any claim of error in the trial court's dismissal of the Enterprise, the Court of Appeals affirmed that portion of the trial court's order. The court reversed the dismissal of Aetna, ruling that the action could proceed against Aetna without joinder of the Enterprise.

## APPEALS COURT DECISION

Although we granted review in this case to resolve issues concerning state and trib-

---

1. HUD provided tribes with a form ordinance, which the White Mountain Apache Tribe adopted verbatim. 24 C.F.R. § 905, Appendix I. The tribal ordinance reads in pertinent part:

 The [tribal] Council hereby gives its irrevocable consent to allowing the Authority to sue and be sued in its corporate name, upon any contract, claim or obligation arising out of its activities under this ordinance and hereby *authorizes the Authority to agree by con-*

*tract to waive any immunity from suit* which it might otherwise have; but *the Tribe shall not be liable for the debts or obligations of the Authority.*

White Mountain Apache Tribal Ordinance No. 47 (Jan. 16, 1963), amended Ordinance No. 102 Art. V(2) (Feb. 2, 1977). (emphasis added). Under this ordinance, thus, the Authority *may,* by contract, waive its sovereign immunity, but it may not obligate the Tribe to pay its debts.

al jurisdiction, some additional comment on other issues decided by the Court of Appeals is appropriate.

Originally in the Court of Appeals Aetna contended that the bonds protected only the Authority, as owner, against the contractor's nonperformance and were not subject to action by an unpaid materialman. Citing this court's decision in *Webb Construction Company v. Crane Company,* 52 Ariz. 299, 80 P.2d 698 (1938), the Court of Appeals held that Smith could maintain the action against Aetna. Construing the bonds as payment bonds in addition to performance bonds, the Court of Appeals held that a materialman was a beneficiary who could maintain a direct action against the surety without using the Tribe as a "conduit" to reach the surety. (149 Ariz. at 548–549, 720 P.2d at 523–524). In this court, Aetna and the Tribe do not contest the ruling that Smith may sue on the bonds in an appropriate court (Petition for Review, p. 2).

· Aetna argued that it is immune from action by Smith because it is entitled to assert its principal's sovereign immunity. The Court of Appeals rejected this argument, and we approve its ruling.

█ Generally, a surety may assert any defense available to its principal. *Spear v. Industrial Comm'n.,* 114 Ariz. 601, 562 P.2d 1099 (App.1977). One exception to this rule is where a principal takes advantage of a personal defense. Personal defenses "are ordinarily of such a character that the principal, as he chooses, may insist upon them or not." 74 Am.Jur.2d *Suretyship* § 104 (1974). The Tribe may choose to waive its sovereign immunity. *White Mountain Apache Indian Tribe v. Shelley,* 107 Ariz. 4, 7, 480 P.2d 654, 657 (1971). Because the Tribe has the power either to insist upon or to waive its sovereign immunity, that immunity is considered a personal defense not available to the Tribe's surety. *See* 74 Am.Jur.2d *Suretyship* § 109.

█ The sovereign immunity doctrine originates in social policy designed to pro-

tect the state "from burdensome interference with the performance of its governmental functions...." 72 Am.Jur.2d *States, Territories, and Dependencies* § 99 (1974). The compensated surety of a sovereign does not perform the governmental functions that require protection; therefore, the protections a government needs to conduct its functions do not extend to the surety. Furthermore, to allow a compensated surety such as Aetna to assert its principal's sovereign immunity and so avoid payment on a bond would be to provide a windfall to the surety. *Centraal Stikstof Verkoopkantoor, N.V. v. Alabama State Docks Department,* 415 F.2d 452, 458 (5th Cir.1969). If Aetna were allowed this defense, it would receive valuable consideration in the form of compensation by the principal, without assuming the risk of payment in the event of its principal's default. *Id.; see generally* 74 Am.Jur.2d *Suretyship* §§ 256–59 (1974). The Court of Appeals refused to sanction such a result. It stated:

> Aetna must surely have been aware of the immunity of its principal from suit, and could have taken steps to protect itself, for example, by requiring the Enterprise and the Authority to identify all subcontractors and suppliers and to obtain releases from the latter prior to final payment. Having failed to do so, it cannot now escape its obligations under the bond under the guise of sovereign immunity.

(149 Ariz. at 553, 720 P.2d at 528.) We agree.

Aetna also argued that the action of the plaintiff could not be maintained against the surety without joinder of the principal.

█ Ordinarily, the principal obligor on a surety bond must be joined in any action against the surety. Ariz.R.Civ.P. 17(f), 16 A.R.S. The rule has an exception permitting actions against a surety without joinder of the principal obligor "when the latter resides beyond the limits of the state, or in such a part of the state that he cannot be reached by ordinary process of law...." *Id.* We agree with the Court of Appeals

holding that the exception was intended to apply where the principal obligor was not subject to "jurisdiction for whatever reason, and is broad enough to encompass the Enterprise, which, although 'residing' within the state of Arizona, cannot be made subject to the court's jurisdiction because of its immunity from suit." (149 Ariz. at 551, 720 P.2d at 526.)

■ Once the principal is shown to be within an exception to Ariz.R.Civ.P. 17(f), the plaintiff may proceed against the surety alone. *First Nat'l Bank of Albuquerque v. The Standard Accident Insurance Co.*, 38 Ariz. 77, 81–82, 297 P. 864, 866 (1931). A creditor's neglect in failing to reach principal does not impair his right to pursue the surety. *Kerby v. State*, 62 Ariz. 294, 308–09, 157 P.2d 698, 705 (1945). The creditor may assert a right against the surety without having taken action against the principal. *In re Yale Express System, Inc.*, 362 F.2d 111, 114 (2d Cir.1966); ALI Restatement, *Security* § 82 (1941).

■ The Court of Appeals also rejected Aetna's contention that HUD regulations deprived state courts of jurisdiction in actions on the bond. (149 Ariz. at 553, 720 P.2d at 528.) We agree.

### TRIBAL COURT JURISDICTION

Aetna and the Tribe assert that federal policy requires that the state courts should suspend their exercise of jurisdiction until the tribal court has determined its own jurisdiction. This court has been referred to federal case authority which requires non-Indian litigants to exhaust tribal court remedies before seeking relief in federal court. For example, where non-Indian litigants ignored service of process and trial in tribal court on advice of counsel and then sought relief in federal court, the Circuit Court of Appeals upheld dismissal of the complaint; the plaintiffs had "failed to exhaust their remedies in tribal court," rendering federal review premature. *A & A Concrete, Inc. v. White Mountain Apache Tribe*, 781 F.2d 1411, 1414 (9th Cir.1986). In *A & A Concrete* the Tribe had sued A & A in tribal court and had received a default

judgment prior to A & A's suit in federal court.

Also, where an Indian plaintiff obtained a default judgment in tribal court against a non-Indian school district located within the confines of the reservation, the United States Supreme Court declared a federal policy of deference to tribal courts in determining the existence and extent of their own jurisdiction. *National Farmers Union Insurance Company v. Crow Tribe*, 471 U.S. ——, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). The Supreme Court would have the existence and extent of tribal court jurisdiction examined

> in the first instance in the Tribal Court itself. Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination. That policy favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge.

*Id.* at ——, 105 S.Ct. at 2454, 85 L.Ed.2d at 827. (footnotes omitted)

In *National Farmers*, the Supreme Court did not deny that the federal district court had jurisdiction; it merely required the district court to withhold jurisdiction until the tribal court had had the opportunity to rule upon the question of jurisdiction. *Id.* at ——, 105 S.Ct. at 2454, 85 L.Ed.2d at 828.

In both *National Farmers* and *A & A Concrete* the tribal courts had exercised jurisdiction and rendered judgment prior to initiation of the federal suits. The federal courts have also declined to exercise jurisdiction when non-Indian plaintiffs sought to challenge tribal exercise of governmental power over them. *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476 (9th Cir. 1985) (Tribe could legitimately exclude non-Indian convicted felon from reservation to preserve safety of residents); *Snow v. Quinault Indian Nation*, 709 F.2d 1319 (9th Cir.1983) (challenge to tribal taxation of businesses on reservation a legitimate matter of self-government and sovereign power best adjudged by tribal court).

The Ninth Circuit stated in *A & A Concrete* that "[t]he Supreme Court has repeatedly recognized that tribal courts have inherent power to adjudicate civil disputes affecting the interests of Indians and non-Indians which are based upon events occurring on the reservation." At 1415–1416 (citations omitted). In *National Farmers, A & A Concrete,* and *Hardin,* the tribal court had initially exercised jurisdiction over tribe member plaintiffs and non-Indian defendants. Because the tribal courts had already assumed jurisdiction, the federal courts declined in these cases to interfere with the determination by tribal courts of the extent of their jurisdiction.

The cases Aetna cites for the proposition that the state courts must suspend jurisdiction in deference to tribal court jurisdictional determination all share a common element: an Indian plaintiff who instituted an action in tribal court.

■ In the case at bench, none of the parties has initiated proceedings in tribal court. There has been no assertion of tribal jurisdiction. It is not a question of initial assumption of jurisdiction by a tribal court. By hearing the merits of this case, the courts of Arizona will *not* be usurping legitimate exercise of asserted tribal court jurisdiction. Thus, there is no need for comity or deference to the tribal court process.

The real question thus becomes, does *this* plaintiff have to file his suit in tribal court? We think not.

Tribal court is not always the appropriate forum for adjudicating occurrences on tribal land. For example, a tribal court does not have criminal jurisdiction to try and to punish non-Indians for offenses committed on the reservation. *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978).

■ On the other hand, tribal courts have jurisdiction in cases involving disputes between Indian and non-Indian parties arising from commercial activity occurring exclusively on the reservation. *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d

251 (1959). The presence of one of two factors renders exercise of state court jurisdiction over disputes involving Indian parties invalid: First, "state action infring[ing] on the right of reservation Indians to make their own laws and be ruled by them," *Id.,* 358 U.S. at 220, 79 S.Ct. at 271, 3 L.Ed.2d at 254; second, federal pre-emption of state authority. *Ramah Navajo School Board, Inc. v. Bureau of Revenue,* 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). Even on the reservation, state laws may be applied unless it would interfere with tribal self-government or would damage a right under federal law. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114, 119 (1973).

In *White Mountain Apache Tribe v. Bracker, supra,* the court suggests a balancing between federal interest in encouraging tribal self-government and state regulatory interest. Although a pre-emption analysis begins with whether specific congressional acts govern a given state action, it ultimately amounts to whether Indian self-government is implicated.

■ Aetna maintains that the adjudication of this case in a state court will have an impact on the White Mountain Apache tribal treasury. Even if such an impact does occur, does state court jurisdiction in this case frustrate federal policy or violate traditional notions of tribal sovereignty?

Both *White Mountain Apache Tribe v. Bracker, supra,* and *Williams v. Lee, supra,* involved intrusions onto the reservations by the State. In *Bracker,* the Arizona Highway Department and the Arizona Highway Commission sought to impose the state's motor carrier tax and excise fuel tax on a non-Indian logging contractor hired by the Tribe for on-reservation logging activities. Because of comprehensive federal regulation of all aspects of Indian timber harvesting, the Court found the additional taxation burdensome, and without justification in terms of state regulatory or service interest. Arizona had "no duties or

responsibilities respecting the reservation Indians," and therefore it frustrated federal policy by reaching onto the reservation to tax even non-Indian participants in on-reservation activities, creating tax impact on the tribe. *Bracker*, 448 U.S. at 152, 100 S.Ct. at 2588, 65 L.Ed.2d at 678.

*Williams v. Lee* likewise involved the state reaching onto the reservation. A non-Indian trading post proprietor sued a reservation Indian in state court for a debt allegedly owed him from sales at his store located on the reservation. A reservation Indian could not reasonably expect to be haled into Arizona state court because of transactions occurring wholly on the reservation; the tribe therefore had a powerful interest in adjudicating the disputes between reservation Indians and non-Indians doing business on Indian land. In comparison, the State had relatively weak interest where non-Indians had interjected themselves into reservation affairs. *Accord, Babbitt Ford v. Navajo Indian Tribe,* 710 F.2d 587 (9th Cir.1983) (tribal court has jurisdiction over repossession on reservation of motor vehicles purchased off reservation by tribe members).

*White Mountain Apache Tribe v. Bracker* and *Williams v. Lee* involved non-Indian regulatory or commercial and judicial intrusion into Indian territory. As the activity in question moves off the reservation the State's governmental and regulatory interest increases dramatically, and federal protectiveness of Indian sovereignty lessens. *Organized Village of Kake v. Egan,* 369 U.S. 60, 75, 82 S.Ct. 562, 571, 7 L.Ed.2d 573 (1962). For example, in *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), an Indian smoke shop proprietor sold cigarettes to both Indians and non-Indians in an area of interspersed reservation and non-reservation land. While taxation of cigarettes sold to Indian patrons of the reservation store was impermissible,

> [t]he State's requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a *minimal burden* designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax.... We see nothing in this burden which frustrates tribal self-government, [citing Williams v. Lee], or runs afoul of any congressional enactment dealing with the affairs of reservation Indians. [citation omitted] ... [T]o the extent that the "smoke shops" sell to those upon whom the State has validly imposed a sales or excise tax with respect to the articles sold, *the State may require the Indian proprietor simply to add the tax to the sales price* and thereby aid the State's collection and enforcement thereof.

*Id.* at 483, 96 S.Ct. at 1646, 48 L.Ed.2d at 112 (emphasis added). *But see McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (Arizona has no jurisdiction to tax income of Navajo tribe members resident on reservation where income derived wholly from reservation sources).

Where state action benefits Indians, a different result occurs. The Ninth Circuit has held that states may apply their workers' compensation laws to all federal territory within state boundaries. *Begay v. Kerr-McGee Corporation,* 682 F.2d 1311, 1319 (9th Cir.1982) (construing 40 U.S.C. § 290). Claims by Indians against their non-Indian employers "and the exercise of state jurisdiction over such claims does not, even minimally, infringe upon or frustrate tribal self-government." *Id.* (citations omitted)

The United States Supreme Court has held that while New Mexico could not impose a use tax on personalty attached by a tribe to off-reservation federal land it leased, the state could legitimately impose a nondiscriminatory gross receipts tax on the ski resort the tribe operated there. *Mescalero Apache Tribe,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable

to all citizens of the State." *Id.* at 148–49, 93 S.Ct. at 1270, 36 L.Ed.2d at 119.

In the present case, the Tribe has reached outside the bounds of the reservation to purchase supplies for its federally-sanctioned and -funded housing project. Unlike the contractors in *A & A Concrete, supra,* and *R.J. Williams Co. v. Fort Belknap Housing Auth.,* 719 F.2d 979 (9th Cir. 1983), Smith engaged in no on-reservation installation. Smith did not conduct his business on the reservation. Under the rationale of *Moe, Begay* and *Mescalero Apache, supra,* the Tribe's reaching out outside the confines of the reservation to engage in commercial activity—without the concomitant reaching in by non-Indians—makes this a proper instance of nondiscriminatory adjudication of a contract claim by the courts of this state.

## FEDERAL POLICY

 The courts of this state may not, nor do they desire to, exercise authority over an Indian tribe. Both the Enabling Act (36 U.S. Stat 567) and the Arizona Constitution (Ariz. Const. art 20 § 4) clearly forbid such assertion of jurisdiction. Aetna, however, contends that an action against it is in effect an indirect action against the Tribe, with the impermissible effect of allowing the successful party to reach tribal resources. *See generally White Mountain Apache Tribe v. Shelley, supra; Morgan v. Colorado River Indian Tribe,* 103 Ariz. 425, 443 P.2d 421 (1968). This contention ignores the nature of Aetna's suretyship with the Enterprise in this situation, and its origin in deliberate federal policies.

Congress has repeatedly acknowledged the obstacles Indians face in achieving economic development and self-sufficiency. For example, the United States House of Representatives Report on legislative histo-

ry for the Indian Financing Act of 1974 (Public Law No. 93–262) declares,

[t]he credit and capital resources necessary for Indian development of their own resources and Indian-owned and operated small business is nowhere near adequate. Lacking their own capital, they must rely on the private money markets. Yet, these resources are practically closed to them. Indian tribes and individuals have been categorized as poor credit risks in the private market for reasons often beyond their control. As a consequence, private credit, if available at all, is only available at interest rates so high as to be prohibitive.

1974 U.S.Code Cong. & Ad.News 2873, 2874. As part of Congress' efforts to aid in Indian development, it has authorized HUD to disburse funds to Indian housing authorities for lower income housing projects. 24 C.F.R. § 905 (1985). When funding lower income housing construction projects, HUD promotes Indian businesses by requiring Indian Housing Authorities to favor the hiring of Indian-owned commercial enterprises or tribal organizations. 24 C.F.R. § 905.106 (1985). For the housing projects in this case, the Authority did contract with an Indian-owned commercial venture, the Enterprise.

The HUD regulations concerning lower income Indian housing also include certain protections for Indian Housing Authorities which commission the construction of housing projects. For instance, the production method the Authority chose here dictated under HUD regulations that the "contractor *shall* be required to provide assurance in the form of 100 percent performance and payment bonds, or a lesser percentage or other security approved by HUD." 24 C.F.R. § 905.203(c) (1905), (emphasis added).[2] The suretyship requirement thus pro-

---

**2.** The "Conventional Method" of housing production *requires* a 100 percent performance-payment bond of the contractor, while the "Turnkey" and "Modified Turnkey" methods *permit* the Authority to require such a bond. Alternatively, the Authority itself may act as contractor. 24 C.F.R. § 905.203 (1985).

A 1979 revision of Indian housing regulations altered only insignificantly the suretyship requirement under former 24 C.F.R. § 805.203(c) (1985), "assurance in the form of 100 percent performance and payment bonds, or other security approved by HUD, such as a letter of credit or escrow." 41 Fed.Reg. 10,160 (1976).

tects the housing authority by assuring completion of the project. It also protects the sub-contractors and suppliers.

While they recognize the need for Indian business development, Congress and HUD are also well aware of the doctrine of tribal immunity. For example, in HUD's regulations promulgating Indian Housing Authorities, it provides tribes with a form tribal ordinance which includes a "sue and be sued" provision. 24 C.F.R. § 905, Appendix I Art. V(2); White Mountain Apache Tribal Ordinance No. 47 (Jan. 16, 1963), amended Ordinance No. 102 (Feb. 2, 1977).[3] This explicit waiver of sovereign immunity facilitates Housing Authorities interaction with non-Indian creditors and suppliers; as a rule, businesses hesitate to sell goods and to extend credit when they know they lack legal recourse should contracts be breached. Tribal immunity generally causes businesses that deal with the tribes to "do so at great financial risk." *S. Unique v. Gila River Pima-Maricopa Indian Community*, 138 Ariz. 378, 386, 674 P.2d 1376, 1384 (App.1983).

HUD requires bonding or alternative assurance of all contractors building Indian housing projects and Public Housing Authority projects. The suretyship requirement is not an authorization to waive sovereign immunity like the "sue and be sued" provision the Tribe enacted in creating the Authority.[4] The Enterprise, as an Indian tribal agency, remains immune from suit without Congressional or tribal consent. *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894, 899 (1940); *White*

*Mountain Apache Indian Tribe v. Shelley, supra.* HUD nevertheless recognized that both Indian and non-Indian parties to housing construction contracts would engage in those contracts more readily with the protection of performance-payment bonds assuring both project completion and payment of subcontractors and materialmen.

In light of the policy goals set by Congress for Indian economic development and for encouraging construction of lower income housing under 42 U.S.C. § 1437, we conclude that HUD intended to encourage non-Indian building subcontractors and suppliers to do business with Indians by providing bonding protection on federally-financed housing projects. Otherwise, there would be no reason to have performance *and payment* bonds.

█ Further, there is nothing in the complex and detailed regulations by HUD on this subject of Indian housing which suggests that subcontractors or suppliers are limited to any specific court to enforce their claims against the bond. On the contrary, "the sue and be sued" regulations for Indian Housing Authorities suggest that it is federal policy that those, who in good faith, supply goods or services to such project should have the same protection and rights as similar persons dealing in the private sector.

The White Mountain Housing Authority is, of course, no longer a party in this action. The general contractor is the Enterprise, an agency of the tribe; nevertheless, that agency was required to furnish a surety bond for the protection of subcon-

---

HUD has explained its requirement of 100 percent performance and payment bonds for conventional method project development by *non-Indian* Public Housing Authorities, as designed "to protect the Federal interest." 24 C.F.R. § 941.102(a) (1985); 45 Fed.Reg. 60,837 (1980). Public Housing Authorities are state, county, municipal or other governmental or public bodies authorized to develop and operate low-income housing. 24 C.F.R. § 941.103 (1985).

**3.** The Authority, however, cannot obligate the Tribe for its own debts. In this case, the White Mountain Apache Housing Authority is not a party.

**4.** "Although charities and municipalities may waive their immunity from suit by purchasing liability insurance and be subject to damages to the extent of the insurance coverage, the purchase of insurance has not been held to waive tribal immunity." Note, *In Defense of Tribal Sovereign Immunity*, 95 HARV.L.REV. 1058, 1073 (1982); *Atkinson v. Haldane*, 569 P.2d 151, 169 (Alaska 1977) (waiver "should [not] be implied from an act which was intended to protect tribal resources"); *Graves v. White Mountain Apache Tribe*, 117 Ariz. 32, 570 P.2d 803 (App. 1977), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978).

tractors and suppliers of materials for the project the same as that required of any private contractor. We find no federal policy which requires actions on such bonds to be brought in tribal or federal court. We believe that federal policy allows the materialman to bring an action on the bond in state court against the surety. As long as the state court does not attempt to assert jurisdiction over the Tribe, there is no violation of the policy against state infringement upon tribal self-government. It is certainly possible, if Smith recovers on the bond, that at some future date Aetna may be able to enforce its indemnity agreement with the Tribe;[5] If the Tribe or the Enterprise has agreed to waive its immunity to suit by Aetna for amounts paid to Smith, that agreement is a matter beyond the consideration of this court. The case before this court is one of a non-Indian materialman suing a non-Indian surety on a performance-payment bond, on which the materialman is an intended beneficiary. We conclude that the action by the plaintiff does not violate federal policy or infringe upon tribal self-government. The decision of the Court of Appeals is approved as supplemented by this opinion, and the judgment of the superior court dismissing the action against the surety is reversed with directions to reinstate the complaint. The dismissal of the action against the Enterprise is affirmed.

HAYS and CAMERON, JJ., concur.

FELDMAN, Justice, dissenting

I dissent.

The majority today in effect holds that the *liability of an Indian tribe* to a creditor of its subcontractor may be determined in state court. The opinion holds that the

result "will *not* be usurping legitimate exercise" of tribal court jurisdiction and does not "interfere with tribal self-government." 149 Ariz. at 529, 720 P.2d at 504. The court reaches this remarkable conclusion by engaging in a magic shadow show which misconstrues the ultimate facts and barely mentions the real issue. The case boils down to a single, simple principle: where both a state and a tribe have an interest in adjudicating a civil matter, strong federal policy in favor of tribal self-government requires the tribal court to determine in the first instance whether it has jurisdiction. *National Farmers Union Insurance Co. v. Crow Tribe of Indians,* — U.S. —, —, 105 S.Ct. 2447, 2454, 85 L.Ed.2d 818 (1985).

### THE FACTS

The majority tells us that this is not a case where non-Indians have "interjected themselves into reservation affairs." 149 Ariz. at 530, 720 P.2d at 505. It is, the majority says, a case of "the Tribe reaching out outside the confines of the reservation to engage in commercial activity—without the concomitant reaching in of non-Indians." 149 Ariz. at 531, 720 P.2d at 506. The court has incorrectly characterized the ultimate facts. They are, simply, that a tribal authority, as owner, engaged a tribal enterprise to act as prime contractor for the construction of an Indian housing project in Indian country for Indian use.[1] Plaintiff knowingly sold plumbing fixtures to a subcontractor obligated to install them in an Indian project in Indian country. Plaintiff *chose* to participate in an undertaking involving Indians and an Indian tribe. Plaintiff's conduct arguably indicates quite clearly that it knew what this

---

**5.** White Mountain Apache Tribe Civil Code § 21.1 Jurisdiction
 The Tribal Court of the White Mountain Apache Tribe shall have jurisdiction over all civil suits wherein an Indian or a member of the White Mountain Apache Tribe or the White Mountain Apache Tribe is a party ...

**1.** The Enterprise which entered into the contract with the non-Indian subcontractor, GS & D Plumbing, is not a distinct entity, but is rather

part of the governmental organization of the Tribe. *Cf. White Mountain Apache Tribe v. Shelley,* 107 Ariz. 4, 480 P.2d 654 (1971); *S. Unique, Ltd. v. Gila River Pima-Maricopa Indian Community,* 138 Ariz. 378, 674 P.2d 1376 (App. 1983). Its assets are tribal resources and cannot be reached by suit in state court. *Shelley, supra; S. Unique, supra; Morgan v. Colorado River Indian Tribe,* 103 Ariz. 425, 443 P.2d 421 (1968).

court professes not to know—that ultimate security for payment for material supplied consisted of a job payment bond on which the principal obligor was the *Enterprise*, a tribal agency.

The majority pretends that the sale of the fixtures from plaintiff to the subcontractor was a simple transaction on open account between non-Indians. (149 Ariz. at 530, 720 P.2d at 505.) Not so. Evidencing plaintiff's knowledge that its plumbing fixtures were to be installed in an Indian project in Indian country are the facts that plaintiff signed lien waivers and entered into both a "Joint Check Agreement" and a "Direct Check Agreement" between it, the subcontractor *and* the Indian General Contractor, White Mountain Apache Development Enterprise, a tribal agency. Also, in its answers to interrogatories it claimed to have a contract with the Enterprise. While most, if not all, of the fixtures not paid for were sold before execution of these documents, certainly the documents provide some evidence that the plaintiff was aware of the circumstances.

Further, it is safe to assume that a firm which describes itself as a vendor of "wholesale plumbing fixtures" in Pinetop-Lakeside, a metropolis of 2,335 people on the edge of the reservation, would have known very well the destination for $300,-000 worth of fixtures. Certainly, the sale of 300 sinks and toilet bowls is an unusual event in such a town. Nevertheless, lacking evidence, the majority prefers to *assume* that this was a simple transaction between non-Indians, unaware of any connection with Indian affairs. (149 Ariz. at 531, 720 P.2d at 506.) The majority's statement that "Smith did not conduct business on the reservation" is gross speculation. The record does not indicate where the sale was made or whether delivery was made to the reservation. The record indicates very little, since the case was decided on motion to dismiss. It does show, however, that a majority of plaintiff's invoices were submitted directly to the tribal agency and paid directly by it.

Plaintiff chose not to sue the non-Indian subcontractor for those invoices not paid, and, instead, brought the action against the Tribe's surety and indemnitee. Thus, the Tribe did not "reach out"; this is a case of "reaching in". *Cf. R.J. Williams Co. v. Fort Belknap Housing Authority*, 719 F.2d 979, 985 (9th Cir.1983) (fact that contract involved housing to be built on the reservation, to be occupied by reservation members and paid for by an agency representing the tribe established the reservation as the locus of the contract dispute), *cert. denied,* —— U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985).

### THE ISSUE

In its lengthy opinion, in which various legal principles appear and disappear like the proverbial pea, the majority only touches upon the real issue when it states that "a preemption analysis ... ultimately amounts to whether Indian self-government is implicated." 149 Ariz. at 529, 720 P.2d at 504. That, in fact, is all that this case is about. If the majority had applied such a preemption analysis it would have reached the correct result.

Although their sovereignty is not absolute, Indian tribes remain a separate people with the power to make and enforce in their own courts substantive law regulating matters which concern the tribe and occur within its geographical territory. *See Williams v. Lee*, 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251 (1959); *R.J. Williams Co. v. Fort Belknap Housing Authority, supra.* Tribes have sovereign power to exercise civil jurisdiction over non-Indians "who enter [into] consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana v. United States*, 450 U.S. 544, 565, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981). Tribal courts are the "appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." *Santa Clara Pueblo v. Martinez*, 436 U.S.

535

49, 65, 98 S.Ct. 1670, 1681, 56 L.Ed.2d 106 (1978).

Having failed to assume civil jurisdiction over Indian tribes and their members as permitted under Pub.L. 83–280, § 6, 67 Stat. 590, Arizona has only limited power to determine matters to which a tribe is a party *or* in which it has an interest. *See generally* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, ch. 6, § C(3)(a) at 362 (1982 ed.); *Williams v. Lee, supra.* Any state attempt to assert jurisdiction over a tribe or its interests must be closely scrutinized. *See United States v. Superior Court,* 144 Ariz. 265, 697 P.2d 658 (1985).

The test for determining whether the state may exercise its jurisdiction in Indian matters was articulated by the United States Supreme Court in *Williams v. Lee, supra.* In that case, a non-Indian operator of a general store on the Navajo Indian Reservation brought suit against Indians in state court to collect for goods sold on credit. The Supreme Court held that

> [t]here can be no doubt that to allow the exercise of state jurisdiction here would *undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves.* It is immaterial that [the general store operator] is not an Indian. He was on the Reservation and the transaction with an Indian took place there. The cases in this Court have consistently guarded the authority of Indian governments over their reservations.... If this power is to be taken away from them, it is for Congress to do it.

358 U.S. at 223, 79 S.Ct. at 272 (citations omitted, emphasis supplied). Thus, the *Williams* test resolves jurisdictional conflicts by providing that a state's authority stops where tribal self-government would be affected. *See Fort Mojave Tribe v. County of San Bernardino,* 543 F.2d 1253, 1256 (9th Cir.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977).

Courts have consistently applied the *Williams v. Lee* "infringement" test to resolve conflicts between state court and tribal court jurisdiction. *See, e.g., United States v. Superior Court, supra; Santa Clara Pueblo v. Martinez, supra; R.J. Williams Co. v. Fort Belknap Housing Authority, supra; Babbitt Ford v. Navajo Indian Tribe,* 710 F.2d 587 (9th Cir.1983). In considering a matter similar to the one before this court, the Ninth Circuit Court of Appeals observed that the question of whether a particular assertion of state jurisdiction will infringe upon tribal self-government generally arises in one of two situations:

> First, if a state or federal court resolves a dispute which was within the province of the tribal courts or of other nonjudicial law-applying tribal institutions, that court would impinge upon the tribe's right to adjudicate controversies arising within it. *Second, if the dispute itself calls into question the validity or propriety of an act fairly attributable to the tribe as a governmental body, tribal self-government is drawn directly into the controversy.*

*R.J. Williams Co. v. Fort Belknap Housing Authority,* 719 F.2d at 983 (citations omitted; emphasis supplied); *see also Montana v. United States,* 450 U.S. at 564–65, 101 S.Ct. at 1257–58. Thus, the question here is whether the dispute between Smith and Aetna is a dispute which involves or determines "an act fairly attributable to the tribe as a governmental body."

### THE TRIBE'S INVOLVEMENT

If Smith obtains a judgment against Aetna, the surety, the latter has a claim for indemnification and reimbursement against the Enterprise. The right of indemnification presumably comes from an indemnification agreement between the Tribe and Aetna. That agreement is not part of this record, although it is referred to. I do not speculate as to its contents. Even if there were no agreement, hornbook law gives a surety a right of reimbursement against the principal obligor. Restatement of Security § 104 (1941). In other words, judgment against Aetna will provide Aetna with

a claim for reimbursement from the Enterprise, which is part of the Tribe and supported by the tribal treasury.

In addition, adverse resolution in state court of whatever defenses exist to Smith's claim will be *res judicata* against Aetna *and* will collaterally estop the Enterprise as principal obligor. This is because a principal obligor is ordinarily bound by judgment rendered against the surety, and collaterally estopped from raising defenses which have been asserted by and determined against the surety. *See* A. STEARNS, THE LAW OF SURETYSHIP § 11.43 at 525–26 (5th ed. 1973); *Farmers Insurance Company of Arizona v. Vagnozzi*, 138 Ariz. 443, 446, 675 P.2d 703, 706 (1983); *United States Fidelity & Guaranty Company v. Alfalfa Seed & Lumber Company*, 38 Ariz. 70, 73, 297 P. 868, 869 (1931).

Because the ultimate party responsible for payment of the claims in this case is the Tribe, state court adjudication of the nature and extent of the liability of the Tribe's surety actually adjudicates the nature and extent of the Tribe's liability. Thus, by taking jurisdiction of the claim filed by Smith against Aetna, our courts will effectively compel tribal agencies to litigate in state court all issues which determine the nature and amount of the Tribe's ultimate liability for the materialman's claim. It is impossible, therefore, to avoid the conclusion that state assumption of jurisdiction infringed upon the Tribe's right of self-government. Having failed even to discuss this point, the majority ends its sentence too soon when it characterizes this as a case "of a non-Indian materialman suing a non-Indian surety on a performance-payment bond." 149 Ariz. at 533, 720 P.2d at 508. Actually, this is a case in which a non-Indian materialman is suing a non-Indian surety on a bond to obtain a judgment *which the Indian tribe itself must ultimately pay.*

## PLAINTIFF'S CONSENSUAL INVOLVEMENT WITH THE TRIBE

By providing materials to be used by a subcontractor for installation in a tribal project in Indian country, Smith should have been well aware that he was entering into a commercial relationship on a tribal project so that tribal courts would have power to exercise civil authority over it. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144–45, 102 S.Ct. 894, 905–06, 71 L.Ed.2d 21 (1982); *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476, 479 (9th Cir.1985). Nevertheless, Smith could still have avoided jurisdiction in tribal court. It could have sued the subcontractor; certainly, a debt action on open account, brought by a non-Indian materialman against a non-Indian subcontractor, properly belongs in state court. However, Smith instead sued Aetna, the Tribe's surety, in an action on the payment bond for a tribal project in Indian country. Even if that action was the result of pragmatic necessity, the result is the same. When Smith sued the Tribe's surety, it directly and ultimately implicated the Tribe as the ultimate source of the payment of the judgment which it sought in state court. *A & A Concrete, Inc. v. White Mountain Apache Tribe*, 781 F.2d 1411 (9th Cir., 1986), *petition for cert. denied,* —— U.S. ——, 106 S.Ct. 2008, 90 L.Ed.2d 659.

Because the action concludes tribal defenses and because the ultimate source of payment of any judgment which Smith may get against Aetna is the Tribe, the latter's right of self-government is implicated and the action should be brought in tribal court, if it has jurisdiction to hear and adjudicate such an action. Any lack of jurisdiction would not result from state or federal law, since the "Supreme Court has repeatedly recognized that tribal courts have inherent power to adjudicate civil disputes affecting the interests of Indians and non-Indians which are based upon events occurring on the reservation." *Id.* at 1415. There might be some lack of jurisdiction because of provisions in the laws of the Tribe, but we have been instructed that the existence and extent of tribal court jurisdiction is "an examination which should be conducted in the first instance in the Tribal Court it-

self." *Id.* (quoting *National Farmers Union Insurance Co. v. Crow Tribe of Indians, supra* ). Interpretation of the tribal code is one of the responsibilities of the tribal court, *Fort Belknap,* 719 F.2d at 983, and any attempt by any other court to determine the jurisdictional question for the Tribe would severely infringe upon the Tribe's "right to adjudicate controversies" arising on the reservation. *See id.; National Farmers Union Insurance Co., supra.*

### DEFERENCE; SUSPENSION OF STATE PROCEEDINGS

The majority argues that adjudication in state court may not affect the Tribe since it may assert its right of sovereign immunity when and if Aetna attempts to obtain indemnification or reimbursement by action against the Tribe. 149 Ariz. at 533, 720 P.2d at 508. This argument is only partly right. If the Tribe does not assert the claim of sovereign immunity, then it will have been compelled by application of the doctrine of collateral estoppel to submit to the adjudication of the nature and amount of Smith's claim and all defenses thereto in state court, when it had a right to have those issues determined in tribal court. If it wishes to avoid that, it will be forced to assert the defense of sovereign immunity to the claim of its surety, thus adversely affecting its ability to do business and make such contracts in the future.

Of course, it is always possible that the Tribe may eventually assert its sovereign immunity[2] as a defense or that the tribal courts will decline jurisdiction of the case. Neither of these possibilities militates against deferring to the preemptive jurisdiction of the tribal court. Although, as noted *ante* at 528, 720 P.2d at 503, examination of tribal jurisdiction should occur first in tribal court, there is no need to dismiss the state action. It may simply be held in abeyance until it is determined that the tribal court has jurisdiction and that the Tribe has waived the defense of sover-

eign immunity. *Cf. National Farmers Union Insurance Co., supra.* If the Tribe does assert the defense at any time, then the action truly becomes one in which tribal interests are not involved and may be allowed to proceed in state court.

### PROTECTION OF MATERIALMEN

The majority argues that by requiring a surety for the Tribe's construction obligations, Congress intended to protect materialmen such as Smith. 149 Ariz. at 532, 720 P.2d at 507. This is true but becomes relevant only by the majority's implicit assumption that non-Indian materialmen will be less protected in tribal court than in state court. This attitude is not supported by law or policy. Congress' decision to require a payment bond is no more than a conclusion that payment bonds were necessary to protect materialmen against the tribes' sovereign immunity from suit. It does not create an implicit exception to the longstanding congressional and judicial policy favoring tribal jurisdiction by authorizing materialmen to establish tribal liability in state courts. Although the majority evidently fears that non-Indians may be treated unfairly in tribal court, it articulates no grounds for its apprehension. No doubt, in the distant past some Indians may have been treated unfairly in state court. The majority opinion is a throwback to those times.

GORDON, V.C.J., concurs in Justice Feldman's dissent.

---

**2.** The majority assumes that the Enterprise did not waive sovereign immunity in the indemnification agreement. I will indulge this assumption.