927 P.2d 347

**STATE of Arizona, Plaintiff–Appellee,**

v.

**Akhtar ZAMAN (TAHIRKHAILI), Defendant–Appellant.**

**No. 1 CA–CV 94–0259.**

Court of Appeals of Arizona, Division 1, Department B.

March 11, 1996.

As Amended May 1, 1996.

Reconsideration Denied May 3, 1996.

Review Granted Nov. 19, 1996.

Stephen G. Udall, Apache County Attorney by Michael Goimarac, Assistant County Attorney, St. Johns, for Plaintiff–Appellee.

John Trebon, Flagstaff, for Defendant–Appellant.

## OPINION

EHRLICH, Judge.

Akhtar Zaman challenges the subject-matter jurisdiction of the Apache County Superior Court over a paternity suit involving a non-Native-American father and a Native–American mother, both of whom resided within the Navajo Nation when all pertinent events occurred. He also argues that service of process, which was effected on him within the Nation by an Apache County deputy sheriff, acting without authority from the Nation, was invalid.

The superior court ruled that it had subject-matter jurisdiction and that the service was proper. We reverse and hold that the superior court did not have subject-matter jurisdiction. So holding, we do not address Zaman's other argument.

## FACTS AND PROCEDURAL HISTORY

Barbara Wilson is an enrolled member of the Navajo Nation, living and working, at all relevant times, in Window Rock, Arizona, which lies within the Nation's boundaries. Zaman is not a Native American; he too lived in Window Rock during all times pertinent to this case.

Beginning in 1982, Zaman and Wilson began a romantic relationship which continued until some time in 1987. For the most part, the relationship was carried on in Window Rock, although they sometimes met in Gallup, New Mexico (which is not within the Nation), and once they met in Albuquerque. However, Zaman and Wilson never were together in Arizona unless it was within the boundaries of the Nation. In January 1987, in Window Rock, they conceived a child, Sahira Zaman, who was born on October 18, 1987, in Gallup. Following her birth, Sahira lived with Wilson in Window Rock. Sahira is eligible to be enrolled as a member of the Navajo Nation.

On September 15, 1988, the state filed this action. It sought to have Zaman adjudged as Sahira's father, to order him to pay child support and certain medical expenses, to grant Wilson custody and to grant Zaman reasonable visitation.[1]

A summons and complaint were served on Zaman in Window Rock by an Apache County deputy sheriff. Zaman responded with a motion to dismiss, asserting that the superior court lacked subject-matter jurisdiction and that the service of process was improper. The court denied the motion without explanation. Zaman then filed a motion for reconsideration, which the court denied.

Almost 2.5 years later, Zaman filed a motion for summary judgment, again raising the issues of subject-matter jurisdiction and service. Again, the court denied the motion and the matter was tried on July 28, 1993.

On January 28, 1994, the superior court determined Zaman to be Sahira's biological father and that he was $29,792 in arrears in child support, set monthly support at $600, gave Wilson custody and established visitation guidelines.[2] Zaman appealed.

## DISCUSSION

State courts are precluded from acting on matters involving Native Americans in two situations: (1) when "state action [would] infring[e] on the right of reservation Indians to make their own laws and be ruled by them" and (2) when the federal government

---

1. The complaint alleged that the state was acting pursuant to the following statutes:

   Proceedings to establish the maternity or paternity of a child or children and to compel support under this article may be commenced by any of the following:
   1. The mother.

   \* \* \* \* \* \*

   5. The state pursuant to § 12–2456.
   Ariz.Rev.Stat.Ann. ("A.R.S.") § 12–843(A).

   The attorney general or county attorney on behalf of this state may initiate an action or intervene in an action to establish, modify or enforce a duty of child support, including medical support, regardless of the welfare or non-welfare status of the person to whom the duty of support is owed. The attorney general or county attorney may establish, modify or enforce such a duty of support by all means available, including all civil and criminal remedies provided by law.
   A.R.S. § 12–2456(A).

   In paternity proceedings, the superior court's judgment "shall direct the amount which the defendant shall pay for the past care and support of the child," A.R.S. § 12–849(A), may direct the father to "pay for the expenses for the lying-in, support of and attendance upon the mother during her confinement," A.R.S. § 12–849(B), and may order either or both parents "to pay any monies reasonable and necessary for the support of the child." A.R.S. § 12–849(C).

   In cases when paternity has been established, any party *except the state* may request custody and visitation orders, and the attorney general and county attorney are prohibited from seeking or defending any such ancillary matters. A.R.S. §§ 12–843(B), 12–2456(C). However, Zaman has not challenged the judgment on this basis.

2. Zaman filed with this court as "supplemental authority" an order of the Navajo Family Court refusing Wilson's petition to enforce the judgment obtained by the state because the state court lacked subject-matter jurisdiction. *Wilson v. Zaman*, No. WR–FC–271–94, Order Granting Motion to Dismiss (Nav.Fam.Ct. Sept. 22, 1995). While this order does not qualify as precedential authority, see Rule 28(c), Ariz.R.Civ.App.P.; *Kriz v. Buckeye Petroleum Co.*, 145 Ariz. 374, 377 n. 3, 701 P.2d 1182, 1185 n. 3 (1985) (memorandum decisions from other courts may not be cited), it does support our determination regarding jurisdiction in this matter.

has preempted state authority. *Smith Plumbing Co., Inc. v. Aetna Casualty & Sur. Co.*, 149 Ariz. 524, 529, 720 P.2d 499, 504 (*quoting Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959), and *citing Ramah Navajo Sch. Bd. v. Bureau of Revenue*, 458 U.S. 832, 837, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174 (1982), and *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980)), *cert denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986). Zaman argues both points: that this action infringes on the right of the Navajo Nation to make and live by its own laws, and that federal statutory law precludes the state court from taking jurisdiction in this case. Agreeing with the first contention, we do not address Zaman's statutory argument.

"The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's History." *Rice v. Olson*, 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945); *see generally* Felix Cohen, HANDBOOK OF FEDERAL INDIAN LAW (1982). Indian reservations traditionally have been considered "distinct political communities, having territorial boundaries, within which their authority is exclusive ... which is not only acknowledged, but guarantied by the United States." *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483 (1832). *See Begay v. Roberts*, 167 Ariz. 375, 378, 807 P.2d 1111, 1114 (App.1990). Under the Indian sovereignty doctrine, only the federal government was empowered with jurisdiction over dealings with Indian nations, even though the Indian lands fell within the geographical boundaries of individual states. *Id.* The laws of the surrounding states, therefore, had no force on the reservations, and citizens of these states were not authorized to enter the reservations or assert authority over them without the assent of the Native Americans themselves and in accordance with the treaties and acts of Congress. *Id.*

They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as states, not as nations, not as possessed of the full attributes of sovereignty, but as a *separate people, with the power of regulating their internal and social relations*, and thus far not brought under the laws of the Union or of the State within whose limits they resided.

*United States v. Kagama*, 118 U.S. 375, 381–82, 6 S.Ct. 1109, 1112–13, 30 L.Ed. 228 (1886) (emphasis added).

■ In 1868, the United States signed a treaty with the Navajo Nation which set aside land in Arizona, New Mexico and Utah for the "exclusive use and occupation of" the Navajos in return for a promise to maintain peace. 15 Stat. 667 (1868). The treaty guaranteed that only authorized agents of the United States government would be permitted within the reserved land. By limiting intrusion on the reservation in this manner, the treaty implicitly provided that "the internal affairs of the Indians remained exclusively within the jurisdiction of whatever tribal government existed." *Williams*, 358 U.S. at 221–22, 79 S.Ct. at 271.

■ Congress has acted consistently with the principle that the states lack jurisdiction over Native Americans living on reserved lands absent an Act of Congress permitting such jurisdiction. When Arizona became a state, 36 Stat. 557, 568–79 (1910), its entry into the Union was expressly conditioned upon its adoption of a constitutional provision disclaiming right and title to reservation lands. *See* Ariz. Const. art. 20, sec. 4. However, Congress later provided the states with a means to assume jurisdiction over the reservations. Public Law 280, enacted in 1953, delegated jurisdiction to several states and permitted other states, such as Arizona, to disregard the constitutional language mandated by their enabling acts and assert by legislation jurisdiction over reservation lands falling within the states' borders.[3] Fifteen years later, Congress passed the Indian Civil Rights Act, 25 U.S.C. § 1301 *et seq.*, which in part modified Public Law 280 by requiring states wishing to assume jurisdiction over Indian lands to first secure the affected

---

3. Act of Aug. 15, 1953, ch. 505, 67 Stat. 588, *codified as amended* at 18 U.S.C. § 1162 (1984), 25 U.S.C. §§ 1321–1326 (1983), and 28 U.S.C. § 1360 (1993). It retains its familiar designation as "Public Law 280."

tribes' consent. 25 U.S.C. §§ 1321, 1322. Desirous states must also amend their constitutions and/or statutes to reflect their assumption of jurisdiction. 25 U.S.C. § 1324. While several states did assume complete jurisdiction, Arizona, generally, did not. *See Tohono O'odham Nation v. Schwartz*, 837 F.Supp. 1024, 1029 (D.Ariz.1993); *Nenna v. Moreno*, 132 Ariz. 565, 566, 647 P.2d 1163, 1164 (App.1982).[4] Absent such implementation, the states have no jurisdiction over Native Americans on Indian reservations. *E.g., McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 177–79, 93 S.Ct. 1257, 1265–66, 36 L.Ed.2d 129 (1973); *Kennerly v. District Court of the Ninth Judicial District of Montana*, 400 U.S. 423, 427–30, 91 S.Ct. 480, 482–84, 27 L.Ed.2d 507 (1971).

■ This court has said:

The Navajo Treaty of 1868 first set forth the concept of the Navajo Tribe as a sovereign entity and that, within the reservation, it possesses the right of self-government. *See Joe v. Marcum*, 621 F.2d 358, 361 (10th Cir.1980). The Navajo Tribe has accordingly created a system of self-government, including a judicial branch consisting of trial and appellate courts, and has enacted the Navajo Tribal Code. *Id.* The Navajo Treaty has been consistently interpreted to preclude state court jurisdiction over Navajos living on the reservation. *McClanahan v. State Tax Comm'n*, 411 U.S. at 175, 93 S.Ct. at 1264.

*Begay v. Roberts*, 167 Ariz. 375, 379, 807 P.2d 1111, 1115 (App.1990). Additionally, "tribal courts have inherent power to adjudicate civil disputes affecting the interests of Indians and non-Indians which are based upon events occurring on the reservation." *Smith Plumbing Co.*, 149 Ariz. at 529, 720 P.2d at 504 (*quoting A & A Concrete, Inc. v. White Mountain Apache Tribe*, 781 F.2d 1411, 1415–16 (9th Cir.), *cert. denied*, 476 U.S. 1117, 106 S.Ct. 2008, 90 L.Ed.2d 659 (1986)). Thus, we must determine whether the state's attempt to establish Zaman's paternity of Sahira and to obtain back child support in-

fringes on the Navajo Nation's right to make and live by its own laws. We conclude that it does.

In *Williams*, the Supreme Court held that Arizona courts lacked jurisdiction over a contract claim by a non-Native American against a Navajo couple when the cause of action arose within the Navajo Nation. The plaintiff ran a general store on the reservation where the defendants bought goods on credit. When the defendants failed to pay, the plaintiff filed suit in the state superior court. Reversing the state court's judgment against the defendants, the Supreme Court stated:

There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves. It is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there. The cases in this Court have consistently guarded the authority of Indian governments over their reservations. Congress recognized this authority in the Navajos in the Treaty of 1868, and has done so ever since. If this power is to be taken away from them, it is for Congress to do it.

358 U.S. at 223, 79 S.Ct. at 272 (citations omitted).

■ If the determination of a contract matter involves the authority of tribal courts over reservation affairs, then so must the determination of a more intimate domestic-relations matter. The Navajo Supreme Court justifiably has called domestic-relations the "core of the tribe's 'internal and social relations.'" *Billie v. Abbott*, —— Nav. Rptr. ——, ——, 16 Indian L.Rep. 6021, 6022 (Navajo 1988). In *Billie*, an enrolled Navajo resident within the Nation sought to prevent a Utah state official from intercepting his federal income tax refund to reimburse the state for money paid to the mother of Billie's child under the Aid to Families with Dependent Children ("AFDC") pro-

---

4. In at least two instances, resolutions to this effect introduced in the Arizona Senate were not passed. S.C.R. 9, 24th Legislature, 1st Reg.Sess. (1959); S.C.R. 9, 23rd Legislature, 2d Reg.Sess. (1958). One exception is the enforcement of air pollution control laws. A.R.S. § 49–561. Another exception was water pollution but that statute was repealed. *See* former A.R.S. § 36–1865.

gram. The Navajo Supreme Court held that the state official's act infringed on Navajo self-government:

> The Navajo Nation's exclusive power to regulate domestic relations among Navajos living within its borders is beyond doubt. The Navajo Nation has codified law and case law regulating Navajo domestic relations. And the Navajo Nation's right to make its own laws and be ruled by them is an established principle in Indian law. *Williams v. Lee*, 358 U.S. 217 [79 S.Ct. 269, 3 L.Ed.2d 251] (1959); *United States v. Wheeler*, 435 U.S. 313 [98 S.Ct. 1079, 55 L.Ed.2d 303] (1978). Accordingly, absent explicit congressional authorization, if a state infringes on the right of reservation Indians to make their own laws and be governed by them, that state has acted outside its authority. *See Williams v. Lee*, 358 U.S. at 220–223 [,79 S.Ct. at 270–272]; *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 173 [93 S.Ct. 1257, 1262–1263, 36 L.Ed.2d 129] (1973). The AFDC legislation does not explicitly authorize Utah to decide tribal domestic relations, thus, Utah's determination of Billie's support obligation is an unlawful interference with Billie's right to be regulated by Navajo law.

*Id.* at ——, 16 Indian L.Rep. at 6022–23. The Navajo courts have jurisdiction to determine maternity and paternity matters. *Descheenie v. Mariano*, —— Nav.Rptr. ——, 15 Indian L.Rep. 6039 (Navajo 1988).[5]

The North Carolina Supreme Court has reached the same conclusion.

> The determination of the paternity of an Indian child is of special interest to tribal self-governance, the right of reservation Indians to make their own laws and be governed by them. Such determination strikes at the essence of the tribe's internal and social relations.

*Jackson County by and through Child Support Enforcement Agency ex rel. Jackson v.*

*Swayney*, 319 N.C. 52, 352 S.E.2d 413, 418–19 (N.C.), *cert. denied*, 484 U.S. 826, 108 S.Ct. 93, 98 L.Ed.2d 54 (1987) (footnote omitted).

On the facts of this case, the jurisdiction of the Navajo courts over the paternity action is exclusive.

> Within Indian country ... [s]tate jurisdiction is precluded even over what are commonly designated as transitory causes of action.... Most reported cases have involved normally transitory claims or were domestic relations cases, which often have ties to more than one jurisdiction. The holdings in these cases preclude concurrent state court jurisdiction over events within Indian country.... However, state courts usually have jurisdiction over Indians where the cause of action or some material event occurs outside Indian country.

Cohen, Handbook of Federal Indian Law, p. 349 n. 13. *See Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) (tribal court had jurisdiction, exclusive of state court, over adoption proceeding when all parties Indians residing on reservation).

It is true that *Descheenie* and *Swayney* are factually distinguishable from this case; in both of them all parties involved were Native Americans, whereas Zaman is not a Native American. We do not find this difference sufficient to change the result, however. A paternity action involves three parties: the mother, the father and the child. The emphasis is on the child because the ultimate intent of paternity and support actions is to obtain what is best for the child. In this case, the child is Navajo and she resided with her mother within the Nation during all relevant periods. Furthermore, the vast majority of Zaman's and Wilson's relationship took place within the Navajo Nation; no pertinent event occurred in Arizona other than there. Thus, at its core, this litigation involves two

---

**5.** The court in *Descheenie* said that "[t]he Navajo Tribal Code does not contain provisions on paternity actions or how to determine child support amounts. We realize that we are treading on legislative ground by setting up these guidelines." *Id.* at ——, 15 Ind.L.Rep. at 6039. Based on this statement, the state argues that *Descheenie* was wrongly decided and urges us to hold that the lack of legislative action means that the Navajo courts lack jurisdiction over such matters. This we will not do. This court does not sit in review of the Navajo Supreme Court and it is not for us to reject an interpretation of Navajo law by its highest court.

Navajos residing within their Nation and a non-Navajo who moved to the Nation, subjecting himself to Navajo law. As the Supreme Court stated in *Williams,* "[i]t is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there." 358 U.S. at 223, 79 S.Ct. at 272.

The state responds with two cases in support of its contention that the state-court action does not infringe on the Navajo Nation's sovereignty. The first is *Three Affiliated Tribes v. Wold Engineering,* 467 U.S. 138, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984). There, the tribal government brought a state-court action against a non-Indian contractor for deficiencies in its work installing a water-supply system on the reservation. The Supreme Court held that the state court had jurisdiction over the matter, saying that, "[a]s a general matter, tribal self-government is not impeded when a State allows an Indian to enter its courts on equal terms with other persons to seek relief against a non-Indian concerning a claim arising in Indian country." *Id.* at 148–49, 104 S.Ct. at 2267. The state relies on *Three Affiliated Tribes* to argue that Wilson chose to bring this action in state court. We disagree.

First, Wilson did not bring this action, although it was she who approached the Apache County Attorney, and she is not a party. The state filed the complaint and prosecuted it to judgment, notwithstanding that Wilson appears to be the "real party in interest" because she is entitled to the benefits of the judgment and arguably could have joined in the action. *Cf.* A.R.S. § 12–2456(A) (state may intervene in a paternity action). Nonetheless, she never was a party; she was not listed as a plaintiff and did not verify the complaint. Her only appearance in the case was as a witness. *Cf. Chalpin v. Mobile Gardens, Inc.,* 18 Ariz.App. 231, 234–35, 501 P.2d 407, 410–11 (1972) ("party" is one who is directly interested in the subject matter of a suit and who has the right to appear and contest matters in litigation; the right arises in the plaintiff by submitting herself to the jurisdiction of the court by filing the complaint and arises in the defendant by being served with process). Wilson did not choose the forum; the State of Arizona did.

Furthermore, in *Three Affiliated Tribes* the tribal laws did not provide the tribal court with jurisdiction over the cause of action and the plaintiff was the tribe itself, not an individual member thereof. The Supreme Court relied on those facts in affirming state-court jurisdiction: "The exercise of state jurisdiction is particularly compatible with tribal autonomy when, as here, the suit is brought by the tribe itself and the tribal court lacked jurisdiction over the claim at the time the suit was instituted." 467 U.S. at 149, 104 S.Ct. at 2269. Here, the Navajo Supreme Court has specifically held that the Navajo courts have jurisdiction over paternity actions. *Three Affiliated Tribes* does not support the state's position.

The state also relies on *New Mexico ex rel. Dep't of Human Services v. Jojola,* 99 N.M. 500, 660 P.2d 590, *appeal dismissed, cert. denied,* 464 U.S. 803, 104 S.Ct. 49, 78 L.Ed.2d 69 (1983). In that case, the state filed a paternity action against the putative father in a state court, despite the fact that the defendant, the mother and the child were all Isleta Indians, and the relationship between the mother and putative father took place on the reservation. The mother had applied for and received public assistance, and assigned to the state her right to child support in accordance with 42 U.S.C. § 602(a). The New Mexico Supreme Court held that the state-court action did not infringe on the right of the Isleta Indians to make their own laws and be ruled by them. It reasoned that the action was among a non-Indian, the state and the Indian defendant, and that the cause of action arose outside the reservation when the mother obtained public assistance and assigned to the state her right to support. The court noted that there were competing interests to serve: the tribe's right to regulate its domestic affairs and the state's right to obtain, from a parent who owes a duty of support, reimbursement for the public assistance it pays to the custodial parent. The court held paramount the state's interest:

> In New Mexico, there are twenty-three separate Indian jurisdictions which may

have different statutes and rules. To require the State of New Mexico to proceed to the various tribal courts of the State would defeat and be a burden on the aims of the public assistance program. Therefore, we find no interference with tribal self-government as long as DHS does not assert jurisdiction within the reservation.

660 P.2d at 593.

Several reasons favor not applying *Jojola*. First, its holding is questionable. In essence, the court held that the burden on the state to utilize the tribal courts to establish paternity meant that there was no interference with tribal self-government if the state utilized state courts. This is illogical. The North Carolina Supreme Court has aptly criticized *Jojola*:

> [W]e are not persuaded by the New Mexico court's reliance on the fact that the cause of action arose outside of the reservation when the mother filed and obtained public assistance and assigned her support rights to DHS. The foundation for the cause of action in both *Jojola* and the case *sub judice* is the determination of parentage; for unless defendant is the father of the child, there is no basis for requiring him to pay child support or reimburse the State for payments made by it. . . .
>
> . . . The determination of the paternity of an Indian child is of special interest to tribal self-governance, the right of reservation Indians to make their own laws and be governed by them. Such determination strikes at the essence of the tribe's internal and social relations. Thus, exclusive tribal court jurisdiction over the determination of paternity, where the defendant is an Indian living on the reservation, is especially important to tribal self-governance. The State's interest in having this matter litigated in its own courts is less compelling. . . . [T]he State may resort to the Court of Indian Offenses to secure a judgment or order determining the paternity of the child, . . . .

*Swayney*, 352 S.E.2d at 418–19 (footnote omitted).

The Navajo Supreme Court has also criticized *Jojola* for its failure to recognize the Nation's interests:

> Navajo statutes and case law reflect Navajo culture and the unique circumstances and needs of the Navajo people living on the reservation. State determinations of tribal domestic relations, no matter how narrow the intrusion, is [sic] always hostile to and in conflict with the needs of the Indian people. For this very reason we disagree with the decision in *New Mexico v. Jojola*, . . . . There, the Court clearly ignored an Indian tribe's right to regulate its internal relations.
>
> A further danger is that state decisions on Navajo domestic relations may cause a decline in Navajo court authority over Navajos and over Navajo domestic relations. . . . Utah's decision on Billie's support obligation would not only adversely affect Navajo authority over internal tribal matters, but it may encourage Navajos to go directly to Utah in hopes of receiving a larger award. State interference would indeed hinder the development of Navajo domestic relations law. There is clearly infringement upon Navajo self-government when a state official decides the child support payments of Navajos living on the reservation.

*Billie*, —— Nav.Rptr. at ——, 16 Indian L.Rep. at 6023 (citations omitted). The same threat to sovereignty would be created here were we to hold that the Arizona court has jurisdiction.

The court in *Billie* agreed that the state may seek a paternity determination from the tribal court in order to obtain a judgment against the delinquent parent:

> Utah and the Navajo Nation, no doubt, can cooperate so that the AFDC legislation is implemented in a way that benefits Navajos living on the reservation without violating the federal purpose. The AFDC legislation is flexible enough so that [the state official] can come to Navajo courts to adjudicate the support amount, or Utah can require Navajo applicants to go first to Navajo courts for support decisions. In this case the Navajo court had continuing jurisdiction over Billie's support obligation, and Utah, which had no jurisdiction, should have required [the mother] to return to the Navajo court.

*Id.* at ——, 16 Indian L.Rep. at 6023. *Swayney* and *Billie* stand for the well-estab-

lished principle that, absent express tribal or congressional action to the contrary, tribes retain a preeminent interest and role in governing the domestic relations of their members. The Navajo Nation's interest in this case includes Wilson and Sahira, and Zaman who,·in coming onto the reservation, subjected himself to Navajo law.

Even accepting the New Mexico court's holding in *Jojola* does not help the state. For all that appears in this record, the state was not pursuing its own interests in prosecuting this case but was simply acting on Wilson's behalf. The only monetary relief requested was current and back child support for Wilson; no reimbursement to the state was sought as was the case in *Jojola.*

█ The state "may not exercise subject matter jurisdiction over transactions arising on Indian reservations unless the transaction entails 'significant' or 'substantial' contacts with the state outside reservation boundaries." *Navajo Nation v. MacDonald,* 180 Ariz. 539, 545–46, 885 P.2d 1104, 1110–11 (App.1994) (*quoting Montana ex rel. Flammond v. Flammond,* 190 Mont. 350, 621 P.2d 471, 472 (1980) (emphasis added in *Navajo Nation* ). In this case, there are no contacts with the state outside the Navajo Nation's boundaries. Consequently, the state court may not exercise subject-matter jurisdiction.[6]

### CONCLUSION

Because the superior court lacked subject-matter jurisdiction over this paternity proceeding, the judgment is reversed.

GRANT, P.J., and NOYES, J., concur.

---

6. Because of our holding, we need not reach Zaman's argument that to allow the state court to decide this matter would be in violation of constitutional equal protection. We quote, however, the following language of the United States Supreme Court:

Finally, we reject the argument that denying the Runsaboves access to the Montana courts constitutes impermissible racial discrimination. The exclusive jurisdiction of the Tribal Court does not derive from the race of the plaintiff but rather from the quasi-sovereign

status of the Northern Cheyenne Tribe under federal law. Moreover, even if a jurisdictional holding occasionally results in denying an Indian plaintiff a forum to which a non-Indian has access, such disparate treatment of the Indian is justified because it is intended to benefit the class of which he is a member by furthering the congressional policy of Indian self-government.  ›

*Fisher,* 424 U.S. at 390–91, 96 S.Ct. at 948 (citation omitted).